928 A.2d 1255

The PENNSYLVANIA GAMING CONTROL
BOARD, Petitioner,

v.

CITY COUNCIL OF PHILADELPHIA; Patricia Rafferty, in Her Capacity as Chief Clerk of City Council of Philadelphia; Philadelphia County Board of Elections; and The Honorable Nelson Diaz, The Honorable Paul Jaffe, and The Honorable Gene Cohen, Acting City Commissioners, in Their Official Capacity as the Philadelphia County Board of Elections, Respondents,

Philadelphia Entertainment and Development Partners, L.P. d/b/a/ Foxwood Casino Philadelphia, HSP Gaming, L.P., Intervenors.

The Pennsylvania Gaming Control Board, Petitioner,

v.

City Council of Philadelphia; Patricia Rafferty, in Her Capacity as Chief Clerk of City Council of Philadelphia; Philadelphia County Board of Elections; and The Honorable Nelson Diaz, The Honorable Paul Jaffe, and The Honorable Gene Cohen, Acting City Commissioners, in Their Official Capacity as the Philadelphia County Board of Elections, Respondents.

Supreme Court of Pennsylvania.

Submitted April 27, 2007.

Decided Aug. 3, 2007.

244

Lance Michael Geren, Esq., Freedman & Lorry, P.C., Philadelphia, for amicus curiae International Longshoremen's Association, et al.

Richard P. Limburg, Esq., Eric G. Fikry, Esq., Jeffrey Brent Rotwitt, Esq., Stephen David Schrier, Esq., Sarah Anne Shapiro, Esq., Obermayer Rebmann Maxwell & Hippel, L.L.P., Philadelphia, for Philadelphia Entertainment and Development Partners, L.P.

Jennifer M. McHugh, Esq., Stephen A. Cozen, Esq., F. Warren Jacoby, Esq., Cozen O'Connor, William H. Lamb, Esq., Scot Russel Withers, Esq., Lamb McErlane, P.C., Richard A. Sprague, Esq., Charles J. Hardy, Esq., Thomas A. Sprague, Esq., Sprague & Sprague, John M. Donnelly, Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., *pro hac vice*, Philadelphia, for HSP Gaming, L.P.

Thomas W. Corbett, Esq., Harrisburg, for Commonwealth of Pennsylvania.

Richard Douglas Sherman, Esq., Francis T. Donaghue, Esq., PA Gaming Control Board, Jeffrey S. Waksman, Esq., Arlene Fickler, Esq., Linda S. Lloyd, Esq., Lawrence T. Hoyle, Jr., Esq., Hoyle, Fickler Herschel & Mathes, L.L.P., Harrisburg, for PA Gaming Control Board.

Maurice Robert Mitts, Esq., Mitts Milavec, L.L.C., Philadelphia, for City Council of Philadelphia, et al.

Romulo Liberio Diaz, Jr. Esq., City of Philadelphia Law Department, City of Philadelphia Board of Elections.

Jennifer M. McHugh, Esq., F. Warren Jacoby, Esq., Stephen A. Cozen, Esq., Cozen O'Connor, William H. Lamb, Esq., Scot Russel Withers, Esq., Lamb McErlane, P.C., Richard A. Sprague, Esq., Charles J. Hardy, Esq., Thomas A. Sprague, Esq., Sprague & Sprague, John M. Donnelly, Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A. *pro hac vice*, Philadelphia, for amicus curiae HSP Gaming L.P.

Richard P. Limburg, Esq., Eric G. Fikry, Esq., Jeffrey Brent Rotwitt, Esq., Stephen David Schrier, Esq., Sarah Anne Shapiro, Esq., Obermayer Rebmann Maxwell & Hippel, L.L.P., Michael Kenneth Coran, Esq., Glenn Aaron Weiner, Esq., Klehr, Harrison, Harvey, Branzburg, & Ellers, L.L.P., Philadelphia, for amicus curiae Philadelphia Entertainment Development Partners d/b/a Foxwoods Casino Philadelphia.

Brian L. Watson, Esq., Howard L. Meyers, Esq., Marc J. Sonnenfeld, Esq., Morgan Lewis & Bockius, L.L.P., Philadelphia, for amicus curiae Greater Philadelphia Chamber of Commerce; Philadelphia Convention & Visitors Bureau; Greater Philadelphia Hotel Association.

Thomas W. Corbett, Jr., Esq., PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

OPINION

CAPPY, C.J.

On December 20, 2006, under the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act" or "Act"), 4 Pa.C.S. § 1101 *et seq.*, the petitioner, the Pennsylvania Gaming Board ("Board"), approved two slot machine licenses for Intervenors, HSP Gaming, L.P. ("HSP") and Philadelphia Entertainment and Development Partners, L.P., ("Philadelphia Entertainment") in the City of Philadelphia ("Philadelphia" or "City"). As part of that decision, the Board approved the location of the licensed facilities that HSP and Philadelphia Entertainment proposed respectively to establish. On March 29, 2007, the City Council of Philadelphia ("City Council") enacted an ordinance (the "Ordinance") that submits a ballot question to Philadelphia's qualified electors, asking them whether the Philadelphia Home Rule Charter should be amended to prohibit City Council and the City's Department of Licenses and Inspections from taking certain actions that would permit the use of gaming within designated areas of the City. The Board filed the above-captioned petitions against City Council, Patricia Rafferty, in her official capacity as the Chief Clerk of City Council, the Philadelphia County Board of Elections, and certain Acting County Commissioners in their official capacity as members of the Philadelphia Board of County Elections (collectively, "Respondents"), seeking to permanently enjoin them from submitting the ballot question to the Philadelphia electorate on election day. We conclude that the Ordinance is contrary to the Gaming Act because it allows the electorate to consider and nullify the decision the Board made as to the location of licensed facilities in Philadelphia and direct City Council and the City's Department of Licenses and Inspections to disregard those local laws by which the Board's decision is to be implemented. Accordingly, we hold that the Board is clearly entitled to the relief it seeks, and order that Respondents are permanently enjoined from placing the question on the ballot.

I

The following material facts as set forth in the Board's Petitions for Review and Briefs and the Briefs of HSP and Philadelphia Entertainment are not disputed. In July of 2004, the General Assembly enacted the Gaming Act, a statute of statewide concern that provides for slot machine gaming at a set number of licensed facilities within the Commonwealth. 4 Pa.C.S. § 1102. The Act established the Board, and gives it the "general and sole regulatory authority over the conduct of gaming or related activities as described in this part." 4 Pa.C.S. §§ 1201(a), 1202(a)(1). The Act defines the "[c]onduct of gaming" as "[t]he licensed placement and operation of games of chance under this part and approved by the [Board] at a licensed facility[,]" and "[l]icensed facility" as "[t]he physical land-based location at which a licensed gaming entity is authorized to place and operate slot machines." 4 Pa.C.S. § 1103. The Board is specifically empowered and obligated under the Act "to issue, approve, renew, revoke, suspend, condition or deny [the] issuance or renewal of slot machine licenses[,]" at its discretion. 4 Pa.C.S. § 1202(b)(12). The Act instructs the Board that the "location and quality of the proposed facility" is a factor that it may take into account when considering an application for a slot machine license. 4 Pa.C.S. § 1325(c)(1).

The Act provides for three types of slot machine licenses, designated by category. 4 Pa.C.S. § 1301. Each category permits an entity or person to apply to the Board for a license, and upon issuance, authorizes the placement and operation of slot machines at a licensed facility. *Id.* Under the Act, a Category 1 license authorizes the placement and operation of slot machines at existing horse racing tracks; a Category 2 license authorizes the placement and operation of slot machines in stand-alone facilities in cities of the first or second class or other tourism locations; and a Category 3 license authorizes the placement and operation of slot machines in resort hotels. 4 Pa.C.S. §§ 1302–1305. The Act states that

two Category 2 licensed facilities "shall be located by the [B]oard within a city of the first class." 4 Pa.C.S. § 1304(b).[1]

As of December of 2005, the Board had received several applications for Category 2 licenses in Philadelphia. HSP and Philadelphia Entertainment were among the applicants. The applications that HSP and Philadelphia Entertainment respectively submitted identified and described the gaming facility each intended to establish in the City. The Board conducted public input hearings and public licensing hearings on the Philadelphia applications in April and November of 2006.

In March of 2006, the City enacted an Ordinance adding Chapter 14–400 to that part of the Philadelphia Code that governs zoning and planning. Chapter 14–400 is intended "to encourage the orderly development of major entertainment facilities," and provides a regulatory framework for the establishment of "Commercial Entertainment District[s]" ("CEDs") in Philadelphia. (Exhibits to the Petitions for Review at 7) Under Chapter 14–400, City Council designates a CED by ordinance in appropriate areas of the City. Upon CED designation, all underlying zoning classifications are superseded, and the owner of a lot in the CED may submit a plan of development to the City's Planning Commission. The plan is reviewed for compliance with the regulations set forth in Chapter 14–400, which cover permitted uses, boundaries, height, off-street parking, signs, off-street loading, and design. Upon approval of the plan by City Council, the City's Department of Licenses and Inspections is authorized to issue the necessary building and zoning permits. As to gaming facilities, Section 14–405 of Chapter 14–400 provides that "[n]othing in this Chapter shall limit the right of the Pennsylvania Gaming Control Board under the [Gaming] Act to identify the property on which it will permit a Category 2 licensed facility within the City[,]" and that "[n]othing in this Chapter shall be construed to prohibit any use that is exclusively regulated and

---

1. Philadelphia is a city of the first class. In 1951, Philadelphia adopted a home rule charter under the terms of the First Class City Home Rule Act, 53 P.S. §§ 13101–13157.

permitted by the Commonwealth under the [Gaming] Act." (Exhibits to Petitions for Review at 8).

On December 20, 2006, the Board held a public meeting to vote on all pending applications for Category 1 and 2 licenses. The Board approved two Category 2 licenses in Philadelphia, for HSP and Philadelphia Entertainment. As part of this decision, the Board approved the locations of the facilities HSP and Philadelphia Entertainment respectively proposed. In the Adjudication of the Pennsylvania Gaming Hearing Board in the Matters of the Applications for Category 2 Slot Machine Licenses in the City of the First Class, Philadelphia the Board issued, the Board observed that the location of HSP's proposed site is in an area of the City zoned for uses compatible with or analogous to gaming, and that the location of Philadelphia Entertainment's proposed site is fully compliant with the requirements of a CED district. The Board also took note of the ordinances that Philadelphia adopted for the creation of CEDs where gaming facilities are permitted, and anticipated that the process outlined in the Philadelphia Code for creating them would move forward.[2]

On or about February 14, 2007, Casino–Free Philadelphia, Inc., a community group, circulated a petition seeking to amend the Philadelphia Home Rule Charter to prohibit City Council and the Department of Licenses and Inspections from taking certain actions that would permit the use of gaming within designated areas of the City. *See* 53 P.S. § 13106.

On February 22, 2007, a member of City Council introduced Bill No. 070112, the precursor of the Ordinance, "[p]roviding for the submission to the qualified electors of the City of Philadelphia of a proposed amendment to the Philadelphia

---

**2.** To date, the process set forth in Chapter 14–400 of the Philadelphia Code has not moved forward, despite requests from HSP and Philadelphia Entertainment for its implementation. We observe that in this regard, Philadelphia Entertainment has commenced proceedings in this Court at Docket No. 88 EM 2007. In these proceedings, Philadelphia Entertainment challenges a bill passed by City Council on May 10, 2007 that amends the City's zoning maps and changes the designation solely on the Philadelphia Entertainment's property from C–3 Commercial to R–10A Residential and the refusal of the City's Department of Licenses and Inspections to issue it a zoning and use registration permit.

Home Rule Charter relating to the location of licensed gaming facilities within the City, as proposed by a petition presented to Council and approved for submission to the electors by Resolution...." (Exhibits in Support of Petitions for Review at 2). That same day, a member of City Council introduced Resolution No. 070113, which set forth the proposed amendment. The proposed amendment would amend Article II, Chapter 3 and Article V, Chapter 10 of the Philadelphia Home Rule Charter to prohibit City Council from taking any action to create a district or otherwise permit gaming in certain areas of Philadelphia and the Department of Licenses and Inspections from issuing licenses or permits for gaming unless the applicant is located in certain authorized areas. The proposed amendment reads:

[Article II, Chapter 3]

* * *

(2) Because licensed gaming facilities cause a deleterious effect on the aesthetics and economics of the areas in which they are located and cause the areas in which they are located to become a focus of crime and anti-social behavior, in order to prevent the deterioration of communities and neighborhoods in the City of Philadelphia, and to provide for the orderly, planned future development of the City, the Council shall not enact any bill, approve the creation of any district, nor take any action permitting the use of Licensed Gaming as defined and authorized by [the Gaming Act] and any other Amendments to Title 4 of the Pennsylvania Consolidated Statutes in any area or district of the City of Philadelphia:

(a) Within 1500 feet of any residentially zoned district (regardless of the actual uses contained therein), Institutional Development District or any of the following residentially related uses:

(i) Churches, monasteries, chapels, synagogues, convents, rectories, religious article stores, religious apparel stores, residential homes, legally occupied dwellings or apartment buildings, or Convention/Civic Center;

(ii) Schools, up to and including the twelfth (12th) grade, and their adjunct play areas;

(iii) Public playgrounds, public swimming pools, public parks and public libraries.

(3) This amendment shall take effect upon approval by the voters and shall render null and void any previous enactment, approval or action taken by the City in conflict with this amendment.

[Article V, Chapter 10]

* * *

(2) The Department of Licenses and Inspections shall not issue any license or permit authorizing Licensed Gaming as defined in [the Gaming Act] and any other Amendments to Title 4 of the Pennsylvania Consolidated Statutes unless the applicant is located within an area or district authorized for Licensed Gaming under Article II, Section 2–307(2)(a) of this Charter.

(Exhibits to the Petitions for Review at 3).

On March 2, 2007, City Council's Committee on Law and Government held a public hearing and received testimony from those in favor of and those against Bill No. 070112 and Resolution No. 070113. HSP and Philadelphia Entertainment appeared and testified in opposition to both. The Committee approved the Bill and the Resolution.

On March 15, 2007, City Council adopted Resolution No. 070113 by unanimous vote.[3] The Resolution provided for the submission of the following question to the Philadelphia electorate, to be answered "Yes" or "No":

3. A petition was filed under 53 P.S. § 13108 in the Court of Common Pleas of Philadelphia County, objecting to the sufficiency of Casino–Free Philadelphia's petition and the validity of its signatures. Ultimately, the court determined that the petition lacked the number of genuine signatures of registered electors that 53 P.S. § 13106 required, granted the objectors' petition and declared Casino–Free Philadelphia's petition null and void. Accordingly, City Council proceeded under 53 P.S. § 13106.

Shall the Philadelphia Home Rule Charter be amended to prohibit Council from taking any action that would permit licensed gaming within 1500 feet of a residentially zoned district, an Institutional Development District, or certain residentially-related uses, and to prohibit the Department of Licenses and Inspections from issuing any license or permit authorizing licensed gaming within such areas?

(Exhibits to Petitions for Review at 2). In addition, City Council unanimously passed Bill No. 070112.

Bill No. 070112 was sent to the Mayor of Philadelphia, The Honorable John F. Street. By letter dated March 29, 2007 to City Council, the Mayor vetoed the Bill. In his letter, the Mayor urged City Council to sustain his veto, stating that: gaming is crucial to the growth of Philadelphia's hospitality and convention center; gaming will support unprecedented job creation in the City; gaming will raise substantial revenue for the City; the City is working to protect local interests; and that the City risks losing local control over the development of gaming sites, should the Philadelphia Home Rule Charter be amended as proposed.

On March 29, 2007, City Council reconsidered Bill No. 070112, and voted to override the Mayor's veto. Therefore, Bill No. 070112 became law, and as an Ordinance of Philadelphia, ordained that the proposed amendment to the City's Home Rule Charter and the above-stated question be submitted to the Philadelphia electorate. *See* 351 Pa.Code § 2.2–202. On March 30, 2007, the Clerk of City Council certified an exact copy of the text of the proposed amendment to the Philadelphia Home Rule Charter, together with the question for the ballot, to City Commissioner Margaret Tartaglione. When certification occurs, under 53 P.S. § 13109, the Philadelphia County Board of Elections is obligated to cause a question to be printed on the ballot.

Under the proposed amendment that the Ordinance submits to the Philadelphia electorate, licensed facilities cannot be located on the sites that the Board approved, City Council cannot designate these sites as CEDs under Chapter 14–400

of the Philadelphia Code, and the City's Department of Licenses and Inspection cannot issue the permits that would be needed to develop the sites into gaming facilities.

On April 5, 2007, at Docket No. 55 EM 2007, the Board filed an Emergency Petition for Review Concerning the Ordinance Passed by City Council for the City of Philadelphia on March 29, 2007 ("Petition I"), and an Emergency Application for Emergency Special Relief Pursuant to Pa.R.A.P. 1532(a). At Docket No. 56 EM 2007, the Board filed an Emergency Application for Leave to File Original Process, an Emergency Petition in the Nature of a Complaint for Declaratory Judgment ("Petition II"), and an Emergency Application for a Preliminary Injunction Pursuant to Pa.R.Civ.P. 1531(a). Respondents filed responses or answers to the Board's filings. City Council and Patricia Rafferty (collectively, the "City Council Respondents") filed an Application for Summary Relief as to Petition I and Petition II, challenging the Board's invocation of this Court's jurisdiction under the Gaming Act and the Board's standing to seek relief. HSP and Philadelphia Entertainment were permitted to intervene at Docket No. 55 EM 2007.

By Order dated April 13, 2007, this Court granted the Board's Application for Leave to File Original Process, granted the Board's request for a preliminary injunction enjoining Respondents from placing the question on the ballot in upcoming election and directed the parties to submit these matters on briefs.[4]

**4.** Amici Curiae briefs have been filed by: The Greater Philadelphia Chamber of Commerce, the Philadelphia Convention & Visitors Bureau, and the Greater Philadelphia Hotel Association; and the Society Hill Civic Association, Neighbors Allied for the Best Riverfront, Bella Vista United Civic Association, Hilary Regan, Bruce Schimmel, John Dietel, Kathleen O'Neill, Bromley Palamountain, Queen Village Neighbors Association, Pennsport Civic Association, Whitman Council, Inc., Paul Neuwirth, Rita Gaudet deVecchis, Barbara Seiple, Kathleen Grann, Jethro Heiko, Chelsea Thompson–Heiko, Anne Dicker, Edmund Goppelt, Northern Liberties Neighbors Association, Mary Reinhart, and Diane Rizzetto, The International Longshoremen's Association District Council of Philadelphia/Wilmington, AFL–CIO.

These matters are now ready for decision. In Petition I, the Board invokes this Court's jurisdiction under 4 Pa.C.S. § 1506, and asserts that the Ordinance is procedurally and substantively defective, and therefore, invalid. In Petition II, the Board invokes this Court's jurisdiction under 4 Pa.C.S. § 1204, and seeks a ruling on the constitutionality of its powers under the Gaming Act relative to the actions taken by Respondents. In both Petitions, the Board requests that a permanent injunction be entered enjoining Respondents from placing the question on the ballot. To obtain this relief, the Board must establish that it has a clear right to relief. *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 663 (2002).

## II

We begin with Petition I, and address the threshold issues raised. The City Council Respondents first assert that § 1506 of the Gaming Act does not provide this Court with jurisdiction to review the Ordinance. The City Council Respondents contend that § 1506 gives this Court jurisdiction to consider appeals of a "final order, determination or decision." *See infra* p. 12. Since the Ordinance is none of these, the City Council Respondent argue that this Court is without jurisdiction under § 1506 to consider the merits of Petition I. The Board and the Intervenors counter that § 1506 grants this Court the exclusive jurisdiction to review a wide variety of local actions involving licensed facilities, including ordinances that a city decides to enact.

Whether § 1506 gives this Court jurisdiction to review the Ordinance under Petition I is a question of statutory construction. Therefore, the Statutory Construction Act of 1972 ("SCA") controls. 1 Pa.C.S. § 1501 *et seq.* Under the SCA, it is fundamental that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly[,] and that [e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). In this regard, the SCA instructs that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded

under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). When, however, the words of the statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language. 1 Pa.C.S. § 1921(c).

The SCA provides that "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). If the General Assembly defines words that are used in a statute, those definitions are binding. *Commonwealth v. Kimmel*, 523 Pa. 107, 565 A.2d 426, 428 (1989). Under the SCA, a court may presume that the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable; does not intend to violate the Constitution of the United States or that of Pennsylvania; and intends the entire statute to be certain and effective. 1 Pa.C.S. § 1922(1)-(3).

Based on these principles, we turn to § 1506's language. Section 1506 states:

§ 1506. Licensed facility zoning and land use appeals

In order to facilitate timely implementation of casino gaming as provided in this part, notwithstanding 42 Pa.C.S. § 933(a)(2) (relating to appeals from government agencies), the Supreme Court of Pennsylvania is vested with exclusive appellate jurisdiction to consider appeals of a final order, determination or decision of a political subdivision or local instrumentality involving zoning, usage, layout, construction or occupancy, including location, size, bulk and use of a licensed facility. The court, as appropriate, may appoint a master to hear an appeal under this section.

4 Pa.C.S. § 1506.

Initially, § 1506 provides this Court with two instructions. In interpreting the statute, we are to remain mindful that § 1506 aims "to facilitate timely implementation of casino gaming," and that 42 Pa.C.S. § 933(a)(2) of the Judicial Code[5]

5. In § 933(a)(2), the Judicial Code gives the court of common pleas the jurisdiction to hear " '[a]ppeals from final orders of government agencies ... except Commonwealth agencies' under Subchapter B of Chapter 7 of Title 2 (relating to judicial review of local agency action) or otherwise." 42 Pa.C.S. § 933(a)(2). Subchapter B of Chapter 7 of

256 is set aside and has no significance in this context. 4 Pa.C.S. § 1506; *see Pleasant Hills Const. Co., Inc. v. Public Auditorium Authority,* 567 Pa. 38, 784 A.2d 1277, 1283 (2001) (concluding that a "notwithstanding" clause is clear, means "regardless," and explicitly preempts the subject mentioned in favor of the subject that follows).

Section 1506 then describes the jurisdiction it vests in this Court. Our jurisdiction is "exclusive" and "appellate" and authorizes us "to consider appeals of a final order, determination or decision of a political subdivision or local instrumentality involving . . . [the] location of a licensed facility." 4 Pa.C.S. § 1506. The SCA defines a "political subdivision" as "[a]ny county, city, borough, incorporated town, township, school district, vocational school district and county institution district." 1 Pa.C.S. § 1991. The dictionary defines a "determination" as "the act of coming to a decision or of fixing or settling a purpose[,]" and a "decision" as "the act or process of deciding; determination, as of a question or doubt, by making a judgment[;] the act or need for making up one's mind[;] something that is decided; resolution." *The Random House Dictionary of the English Language* 517, 541 (2nd ed.1987).

Last, § 1506 advises us that the Court may appoint a master when it is deemed necessary for the proper disposition of the appeals the statute empowers us to consider.

In our view, § 1506 is clear and explicit in vesting this Court with jurisdiction over Petition I. By its terms, § 1506 creates an appeal that may be taken from local actions that amount to, *inter alia,* a determination or decision of a political subdivision involving the location of licensed facilities. Moreover, § 1506 places the resolution of the appeal created exclusively in this Court.

Here, the particular local action under challenge is the Ordinance. The Ordinance was enacted by the City in order to give its electorate the opportunity to consider a ballot

Title 2 is the Local Agency Law, 2 Pa.C.S. §§ 551–555, 751–754. Under the Local Agency Law, local administrative actions that constitute adjudications are subject to review in the court of common pleas under § 933(a)(2). *See* 2 Pa.C.S. § 752; 2 Pa.C.S. § 101.

question having to do with where in the City licensed facilities may be located. Based on the words in § 1506 and their plain meaning, we conclude that the Ordinance is a determination or decision made by a political subdivision involving, *inter alia*, the location of licensed facilities. Hence, we also conclude that the subject of Petition I falls squarely within the local matters the appeal created by § 1506 captures. Our conclusion, which interprets § 1506 to provide for this Court's immediate and conclusive consideration of the questions raised regarding the Ordinance, adheres to and effectuates the General Assembly's expressly stated aim in § 1506 to facilitate the timely implementation of gaming into the Commonwealth. *Id.* In addition, it is consistent with the presumption that the General Assembly does not intend an absurd result in its statutes. *See* 1 Pa.C.S. § 1922(1). It would make no sense for us to conclude that at the same time the General Assembly gave this Court the exclusive original jurisdiction to hear declaratory judgments concerning the constitutionality of the Gaming Act, *see* 4 Pa.C.S. § 1904, and the exclusive appellate jurisdiction to consider appeals from the Board's approval, issuance, denial or conditioning of a slot machine license, *see* 4 Pa.C.S. § 1204, it opted not to vest this Court with the exclusive authority to review an ordinance that impacts on an issue as fundamental as the actual establishment of the facilities in which licensed gaming will take place.

Accordingly, we hold that under § 1506, this Court has jurisdiction over Petition I.[6]

6. Although we have concluded that as a matter of statutory construction that § 1506 vests this Court with jurisdiction over Petition I, we would remiss in failing to note that this matter also clearly merits the invocation of our King's Bench powers. 42 Pa.C.S. § 502 ("The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722."); *In re Avellino*, 547 Pa. 385, 690 A.2d 1138, 1140-41 (1997).

Petition I concerns the Gaming Act, a statute that has widespread importance, and one that has generated and continues to generate substantial public attention. The issues raised are foundational. They

## III

■ Relying on *Mt. Lebanon v. County Board of Elections of the County of Allegheny*, 470 Pa. 317, 368 A.2d 648, 649–50 (1977), the City Council Respondents also argue that because the Philadelphia electorate has not yet had the opportunity to vote on the question that the Ordinance enables it to consider, this Court's opinion would be merely advisory because it would be rendered before the process is complete. They urge us to stay our hand, and consider the legality of the Ordinance if and when the voters approve the proposed amendment to the Philadelphia Home Rule Charter. We disagree. The fundamental point that the City Council Respondents miss is that the Board and the Intervenors argue that the General Assembly has given the Board the sole authority to locate licensed facilities in Philadelphia and does did not give the City's electorate the right to consider or override that decision or to prevent the implementation of that decision under the City's laws. In other words, the pending opportunity for the voters to pass upon this matter via the ballot question is as much a concern to the Board and the Intervenors as is the outcome of the vote, should it take place. Thus, our present opinion is neither theoretical nor abstract. Rather, it addresses the legality of the Ordinance on its face and the effect it has had already-to submit a question to the Philadelphia electorate that impacts on and could nullify the Board's decision to locate licensed facilities in the City and the process of putting that decision in place. *See Deer Creek Drainage Basin Authority v. County Board of Elections of Allegheny County*, 475 Pa.

relate to the parameters of the Board's authority to make and implement its decision on as basic an issue as the location of gaming facilities and the interplay between the Board's authority in this regard and that of local authorities. Because the Act is so recently enacted, there is no body of case law to guide the resolution of these issues. Moreover and significantly, the questions are raised within the context of the election process, and concern the fundamental issue of whether a question may lawfully be placed on the ballot for the electorate to consider. All of these matters are of profound importance, and deserve prompt and conclusive judicial review. Under the circumstances, it is obvious that the invocation of our King's Bench powers is also the means by which we insure the judiciary's ability to decide these matters justly and expeditiously. *Id.*

491, 381 A.2d 103 (1977) (directing that all steps be taken to ensure that a referendum question that was invalid and would have no legal effect is not presented on the ballot so as to avoid unnecessary voter confusion and the unjustified expenditure of public resources on an inoperative election, and to protect the interests of all parties).

## IV

■■ The City Council Respondents also assert that the Board, as an administrative agency, is without a pecuniary or other real stake in this controversy, and thus, does not have standing. It is true that a party who does not have standing, that is, a party who is unable to show that he has been "aggrieved" by the matter he seeks to challenge, may not seek judicial relief. *Pittsburgh Palisades Park, LLC v. Commonwealth*, 585 Pa. 196, 888 A.2d 655, 660 (2005). A party is aggrieved if he can demonstrate that he has a substantial, direct, and immediate interest in the outcome of the litigation. *Id.* This Court has explained that:

A "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens procuring obedience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it.

*In re Hickson*, 573 Pa. 127, 821 A.2d 1238, 1243 (2003) (citations omitted).

■ Mindful of these principles, we observe that the Board asserts that the submission of the proposed amendment to the Philadelphia electorate, made possible through passage of the Ordinance, effectively allows the Philadelphia electorate to pass on and negate the decision it made on December 20, 2006 to locate licensed facilities in Philadelphia. This, the Board argues, thwarts the exercise of its statutory duty and authority under the Gaming Act, and gives it standing.

We agree. In asserting that the Ordinance diminishes the authority it is given under the Act to satisfy its statutory duty to locate licensed facilities in cites of the first class, the Board exhibits a substantial, direct, and immediate interest in the outcome of these matters and is aggrieved. In this regard, we note that the Board's interest in this litigation clearly exceeds that of "the common interest of all citizens procuring obedience to the law," because the Board, unlike the general public, has the statutory obligation to approve the issuance of gaming licenses, which includes the obligation to approve the location of gaming facilities. 4 Pa.C.S. §§ 1202(b)(12);1304(b)(1),1325(c)(1); *Hickson*, 821 A.2d at 1243. Moreover, it is indisputable that the Ordinance harms the interests the Board asserts it has in that it allows the Philadelphia voters the opportunity to override the decision the Board made as to where licensed facilities will be located in the City and the process of putting that decision in place. Finally, we observe that there is a clear and immediate causal connection between the Ordinance and the Board's ability to exercise the statutory authority the Gaming Act gives it and fulfill the obligations the Gaming Act places upon it to locate Philadelphia's licensed facilities. *See id.* Thus, we conclude that the Board is aggrieved, with standing to pursue this matter. *See Dauphin County Public Defender's Office v. Court of Common Pleas of Dauphin County*, 578 Pa. 59, 849 A.2d 1145, 1148–49 (2004) (concluding that the Public Defender had standing to challenge an administrative order that impacted on its ability to satisfy its statutory obligation to provide legal representation to financially eligible criminal defendants and stripped it of its discretion to make decisions regarding an applicant's eligibility for its services).

## V

Turning to the merits of Petition I, the validity of the Ordinance is challenged on several grounds. These grounds include the assertion that the Ordinance is invalid because it is inconsistent with the Gaming Act and amounts to

an exercise of power by the City it does not have.[7] In this regard, the Board and the Intervenors contend that in the Gaming Act, the General Assembly gave the Board the sole authority to locate the licensed facilities in which slot machines may be placed and operated when it issues a Category 2 gaming license in Philadelphia. Therefore, the Ordinance is invalid because it allows the Philadelphia electorate to consider the Board's decision as to the location of licensed facilities in the City and it if so chooses, nullify the decision made.[8]

Like the question of jurisdiction over Petition I, the parameters of the Board's authority to locate licensed facilities in Philadelphia is a question of statutory construction under the SCA. Sections 1304(b)(1) and Section 1307 are on point. Section 1304(b)(1) provides:

§ 1304. Category 2 slot machine license

\* \* \*

(b) Location.—

(1) Two Category 2 licensed facilities and no more *shall be located by the board within a city of the first class,* and one Category 2 licensed facility and no more shall be located by the board within a city of the second class. No *Category 2 licensed facility located by the board within a city of the first class* shall be within ten linear miles of a Category 1 licensed facility regardless of the municipality where the Category 1 licensed facility is located. Except for any *Category 2 licensed facility located by the board within a city of the first class* or a city of the second class, no Category 2 licensed facility shall be located within 30 linear miles of any Category 1 licensed facility that has conducted over 200 racing days per year for the two calendar years

7. The question we address concerning the Ordinance's validity is a pure question of law. We consider questions of law *de novo.*

8. Respondents did not brief this issue. We do note, however, that Respondents Philadelphia County Board of Elections and its Members state that "[w]e continue to hold to the same position ... that the Charter change, if adopted, would be a nullity as it conflicts with State law...." (Brief of the Philadelphia County Board of Elections and the Members of the Board of Elections in their Official Capacity at p. 1.)

immediately preceding the effective date of this part and not within 20 linear miles of any other Category 1 licensed facility. Except for any *Category 2 licensed facility located by the board within a city of the first class,* no Category 2 licensed facility shall be located within 20 linear miles of another Category 2 licensed facility.

4 Pa.C.S. § 1304(b)(1) (emphasis added). Section 1307 provides:

§ 1307. Number of slot machines.

The board may license no more than seven Category 1 licensed facilities and no more than five Category 2 licensed facilities, as it may deem appropriate, as long as two, and not more, *Category 2 licenses are located by the board within the city of the first class* and that one, and not more, Category 2 licensed facility is located by the board within the city of the second class. . . .

4 Pa.C.S. § 1307 (emphasis added).

We conclude that the words of these statutory provisions are clear and explicit and reveal that the General Assembly intended for the Board to have the sole authority to locate Category 2 licensed facilities in cities of the first class. That is to say, only the Board makes the decision to locate a licensed facility. Section 1304(b)(1) repeatedly states without equivocation that "Category 2 licensed facilities[ ]shall be located by the [B]oard in cities of the first class," and both Section 1304(b)(1) and 1307 refer to "Category 2 licenses" or "Category 2 licensed facilities" that have been "located by the [B]oard." 4 Pa.C.S. §§ 1304(b)(1),1307. We further observe that in these provisions, the General Assembly has not afforded the electorate of a first class city the right to consider, affect or override the Board's location decision once it is made.

The Board does not, however, exercise its sole authority under the Gaming Act to fix the site of licensed facilities within Philadelphia in a vacuum. This is because the General Assembly has given Philadelphia the power to zone. *See Commonwealth, Department of General Services v. Ogontz Area Neighbors Ass'n,* 505 Pa. 614, 483 A.2d 448, 451 (1984)

(recognizing that Philadelphia, as a home rule city, derives its power generally to govern itself and to enact zoning regulations from the Home Rule Act, 53 P.S. § 13101, but that to the extent that provisions of the Zoning Enabling Act, 53 P.S. § 14752, are not inconsistent with Philadelphia's zoning regulations, they remain in force.) Thus, while the Board and only the Board is authorized to decide where Philadelphia's licensed facilities will be placed, the question as to whether the General Assembly intended the Board's authority to locate to be exercised without any regard to the City's authority to zone remains. *See id.*

We have confronted the interplay between local zoning and land use regulations and the Gaming Act before. In *Pennsylvanians Against Gambling Expansion Fund v. Commonwealth ("PAGE")*, 877 A.2d 383 (2005), we addressed the constitutionality of former § 1506, which as originally enacted expressly preempted local land use and zoning ordinances "as [to the] conduct of gaming ... including the physical location of any licensed facility[ ]to the extent that the licensed facility [had] been approved by the Board".[9] The petitioners in *PAGE* asserted that former § 1506 violated Article II, Section

**9.** Section § 1506 as originally enacted stated:

The conduct of gaming as permitted under this part, including the physical location of any licensed facility, shall not be prohibited or otherwise regulated by any ordinance, home rule charter provision, resolution, rule or regulation of any political subdivision or any local or State instrumentality or authority that relates to zoning or land use to the extent that the licensed facility has been approved by the board. The board may, in its discretion consider such local zoning ordinances when considering an application for a slot machine license. The board may, in its discretion consider such local zoning ordinances when considering an application for a slot machine license. The board shall provide the political subdivision, within which an applicant for a slot machine license has proposed to locate a licensed gaming facility, a 60–day comment period prior to the board's final approval, condition or denial of approval of its application for a slot machine license. The political subdivision may make recommendations to the board for improvements to the applicant's proposed site plans that take into account the impact on the local community, including, but not limited to, land use and transportation impact. This section shall also apply to any proposed racetrack or licensed racetrack.
4 Pa.C.S. § 1506 as originally enacted (amended Act of Nov. 1, 2006, P.L. 1243, No. 135 § 9.)

1 of the Pennsylvania Constitution, which provides that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1. In their challenge, the petitioners did not take issue with the constitutionality of former § 1506 because of its preemptive effect over local zoning and land use regulations. Rather, they argued that former § 1506 was unconstitutional because the General Assembly had empowered the Board to act like a super-zoning board without providing definite, reasonable, and lawful standards to limit and guide it. *PAGE* at 415. The respondents countered that former § 1506 passed constitutional muster because the Board's authority with regard to zoning and land use matters was not unfettered, but limited and guided by the standards set forth in other provisions of the Act, namely, Sections 1102, 1302–1305, and 1325. *Id.* at 416–17.

This Court agreed with the petitioners, stating:

Section 1506 does not provide the Gaming Control Board with definite standards, policies and limitations to guide its decision-making with regard to zoning issues. While Section 1506 allows the Board in its discretion to consider local zoning ordinances when reviewing an application for a slot machine license and to provide a 60–day comment period prior to final approval, the Board is not given any guidance as to the import of the same. Although the eligibility requirements and additional criteria guide the Board's discretion in determining whether to approve a licensee, we find that they do not provide adequate standards upon which the Board may rely in considering the local zoning and land use provisions for the site of the facility itself. We conclude that, as a matter of law, Section 1506 does not comply with the dictates of Article II, Section I insofar as the General Assembly has failed to provide adequate standards and guidelines required to delegate, constitutionally, the power and authority to execute or administer that provision of the Act to the Board.

*Id.* at 418–19 (footnote omitted). Accordingly, this Court declared § 1506 as originally enacted to be unconstitutional and severed it from the Act. *Id.* at 419.[10]

In 2006, following *PAGE*, the General Assembly reenacted § 1506. Act of Nov. 1, 2006, P.L. 1243, No. 135 § 9. As discussed, Section 1506 now provides for judicial review of local final orders, determinations or decisions involving, *inter alia,* the location of licensed facilities. 4 Pa.C.S. § 1506.

Accordingly, under the Gaming Act, the General Assembly obligates the Board to locate licensed facilities in first class cities and intends for the Board to make that decision alone. 4 Pa.C.S. §§ 1304(b)(1),1307. After the Board's decision on location is made, the General Assembly intends for it to be implemented under and according to the zoning and land use provisions a city has enacted. *See Ogontz,* 483 A.2d at 448. Should the Board's decision on location be challenged, the General Assembly intends that any review of the final order, determination or decision a city makes in this regard take place in this Court. 4 Pa.C.S. § 1506. Under the Act, the General Assembly does not intend for the electorate of a first class city to be given the opportunity to consider, approve, disapprove, nullify or otherwise affect the Board's decision once it is made or to prevent its implementation. 4 Pa.C.S. §§ 1304, 1307, 1506.

■■ Having thus resolved the General Assembly's intent in the Gaming Act, we consider the Board's and Intervenors' assertion that the Ordinance is invalid. As a general matter, municipalities are creatures of the state and "possess only

10. To be clear, in this particular matter, Respondents have not raised that in making its decision to locate the City's licensed facilities, the Board offended Article II, Section 1 of the Pennsylvania Constitution, PA CONST. art. II, § 1, or acted in ways that are forbidden under *PAGE*. Nor have they asserted that either of the locations for licensed facilities the Board approved for Philadelphia is contrary to the City's zoning and land use provisions. As we observed, when the Board announced its decision on the applications for licenses in the City, it noted that the location of HSP's proposed site is in an area of the City zoned for uses compatible with or analogous to gaming, and that the location of Philadelphia Entertainment's proposed site is fully compliant with the requirements of a CED district. *See supra* pp. 5–6.

such powers of government as are expressly granted to [them] and as are necessary to carry the same into effect." *Devlin v. City of Philadelphia*, 580 Pa. 564, 862 A.2d 1234, 1242 (2004) (alteration in original) (quoting *City of Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75, 84 (2004)). A municipality is therefore powerless to enact ordinances except as authorized by statute, and ordinances not in conformity with the municipality's enabling statute will be void. *Id.*

Like the powers of other types of municipalities, the powers of a home rule municipality, like Philadelphia, are largely constitutionally and statutorily determined. The Pennsylvania Constitution provides that "[m]unicipalities shall have the right and power to frame and adopt home rule charters" and that pursuant to such charters, a home rule municipality "may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." PA. CONST. art. IX, § 2. The First Class City Home Rule Act provides that a city "taking advantage of this act and ... amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions ... [,]" subject to certain enumerated limitations. 53 P.S. § 13131. Among the limitations are that "no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are ... [a]pplicable in every part of the Commonwealth." 53 P.S. § 13133(b). With respect to this second limitation, this Court has explained that ordinances enacted by home rule municipalities are negated when they conflict with a statute the General Assembly has enacted concerning "substantive matters of statewide concern." *Ortiz v. Commonwealth*, 545 Pa. 279, 681 A.2d 152, 156 (1996).

In view of these principles and our determination regarding the Board's authority to locate licensed facilities under the Gaming Act and the process by which that decision is to be implemented once it is made, we can only conclude that the Ordinance permits that which the Gaming Act forbids. There-

fore, the Ordinance is in conflict with the Act. The Act does not allow the Philadelphia electorate the right through any means whatsoever to consider or nullify the decision the Board made to locate two Category 2 licensed facilities in the City, as does the Ordinance. The Act does not give the Philadelphia electorate the right to direct City Council and the City's Department of Licenses and Inspections to disregard those portions of the Philadelphia Code or any other local law by which the Board's decision is to be implemented. We hold accordingly, that the Ordinance is an unlawful and unconstitutional exercise of power, and invalid. PA. CONST. art. IX, § 2; 53 P.S. § 13133(b).[11] We further hold that the Board has established a clear right to a permanent injunction enjoining Respondents from placing the question on the ballot under the Ordinance.

For these reasons, it is ordered that Respondents are permanently enjoined from placing the question on the ballot. It is also ordered that the Application for Summary Relief filed by the City Respondents as to Petition I is denied, Petition II is dismissed as moot, and the Application for Summary Relief filed by the City Respondents as to Petition II is dismissed as moot.

Justice EAKIN, Justice BALDWIN and Justice FITZGERALD join the opinion.

Justice BAER files a concurring opinion.

Justice CASTILLE files a dissenting opinion.

Justice SAYLOR files a dissenting opinion.

11. In Petition I, the Board also asserts that City Council committed a variety of procedural errors in approving the Ordinance; that the Ordinance improperly amounts to zoning by referendum; and that the Ordinance is *de facto* exclusionary in that it impermissibly excludes licensed zoning from Philadelphia. Due to our resolution, we need not address these other challenges. In addition, Petition II is rendered moot, as is the Application for Summary Relief filed by the City Council Respondents to Petition II.

268

BAER, J, concurring.

I disagree with the majority's conclusion that the Pennsylvania Race Horse Development and Gaming Act (Gaming Act or Act), 4 Pa.C.S. § 1101 *et seq.*, provides this Court with jurisdiction to decide the action brought by the Pennsylvania Gaming Control Board (Board). Nevertheless, because I believe this Court has jurisdiction to decide this matter on an alternative basis and, as I agree with the majority's ultimate merits determination that a permanent injunction is warranted, I concur in the result reached by the majority.[1]

Like Mr. Justice Saylor, I believe that the Gaming Act's grant of appellate jurisdiction to this Court pursuant to Section 1506 of the Act, 4 Pa.C.S. § 1506, does not warrant our review of the Board's request for injunctive relief, which is a matter directed to the original jurisdiction of a court. *See* Saylor, J. Dissent at 2 ("A challenge in the courts to a legislative act, such as the Philadelphia ordinance presently at

1. In addition to having a basis to invoke this Court's jurisdiction, as a general proposition, the Board must also be able to demonstrate that this matter presents a "case or controversy," appropriate for judicial resolution, *see, Public Defender's Office of Venango County v. Venango County Court of Common Pleas*, 586 Pa. 317, 893 A.2d 1275, 1279 (2006), and that the Board has been aggrieved by the actions giving rise to such case or controversy, so that the Board has standing to seek relief, *see Pittsburgh Palisades Park, LLC v. Commonwealth*, 585 Pa. 196, 888 A.2d 655, 660 (2005). Regarding these prerequisites to a merits determination, I agree with the majority that the board is aggrieved by Council's passage of the ordinance and its implementation, as such presumes to provide the electorate with the opportunity to override the Board's decision regarding where licensed facilities are to be located. I agree also with the majority's conclusion that the Board possesses standing to seek to enjoin implementation of the ordinance, based upon the Board's statutory duty to locate licensed facilities within cities of the first class. *See* 4 Pa.C.S. § 1304(b)(1). Moreover, given my agreement with the majority's ultimate decision on the merits, that a permanent injunction is warranted because the Board has sole authority to locate the licensed facilities at issue, the resulting of the referendum would be a nullity. In my view, it is crucially important that we prevent an election that is void from the outset. *See Deer Creek Drainage Basin Authority v. County Board of Elections of Allegheny County*, 475 Pa. 491, 381 A.2d 103, 107 (1977)(indicating, in a case where a referendum could result in a measure that would be void from the outset that, "[i]n order to avoid unnecessary voter confusion and the unjustified expenditure of public resources on an inoperative election, and to protect the interests of all parties, injunctive relief is appropriate.").

issue, is conventionally understood to represent an original jurisdiction matter.").

Accordingly, I do not believe the Board properly invoked this Court's jurisdiction through its erroneous assertion that we possess jurisdiction pursuant to Section 1506 of the Gaming Act. Nevertheless, because I believe the matter could have been commenced properly in a court having original jurisdiction, rather than dismiss the action, the proper procedure would be to transfer the case to such tribunal. *See* Pa.R.C.P 1032(b)(specifying that, "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter ... the court shall order that the action be transferred to a court of the Commonwealth which has jurisdiction"); *see also* 42 Pa.C.S. § 5103("If an appeal or other matter is taken to or brought in a court or magisterial district of this Commonwealth which does not have jurisdiction of the appeal or other matter, the court or district justice shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper tribunal of this Commonwealth").

Having determined that the instant action for injunctive relief could have been brought in an appropriate court possessing original jurisdiction, I also note that this Court could have then invoked its "extraordinary jurisdiction," *see* 42 Pa.C.S. § 726, and assumed plenary jurisdiction over the case, resulting in it being transferred back to this Court for final adjudication. I believe that rather than insisting on such procedural maneuvering, under the facts of this case and at this juncture, we should simply keep and decide it given the importance of the issue, the time frame involved and our interest in judicial economy and expediency. *See id.* (Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or district justice of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done); *see also Deer Creek Drainage Basin Authority v. County Board of Elections of Allegheny County,*

475 Pa. 491, 381 A.2d 103, n. 3 (1977) (where we, likewise, exercised our plenary jurisdiction in view of the important public election issue involving whether a potentially void referendum matter should be enjoined).

Based on the foregoing, I believe our Court may properly address the merits of the Board's request for injunctive relief. In this regard, I concur in the result reached by the majority that such relief is warranted.

Justice CASTILLE, dissenting.

Over the dissent of Mr. Justice Saylor, which I joined, this Court entered a *per curiam* order on April 13, 2007, which granted extraordinary, preliminary injunctive relief to the Pennsylvania Gaming Control Board ("Board"), relief which prohibited Philadelphia primary voters from passing on a ballot referendum concerning a zoning amendment to the Philadelphia City Charter. The *per curiam* order contained no citation explaining the jurisdictional basis for the Court's order in prohibition, nor any merits citation or discussion to justify the extraordinary relief granted. The Court goes a step further today and grants a permanent injunction, ordering that the citizens of Philadelphia shall never be permitted to vote upon the Charter change referendum their local representatives would have them consider. In its opinion, the Court confines itself to the permanent injunction, and does not attempt to explain why it granted preliminary injunctive relief.

The error in the Court's April 13 order is perhaps understandable, given the time constraints when the Board's so-called "emergency" petitions were filed. But, this Court has since had ample time for more careful deliberation concerning the propriety of injunctive relief. That deliberation, of course, creates an uncomfortable situation for the Court, should it recognize that its original suspension of the franchise was erroneous, since correction requires admitting the mistake; perhaps that is why the Majority does not attempt to explain how its initial order was justified under the stringent standard applicable to preliminary injunctions. But admitting a mistake is our duty, in an appropriate case. I am convinced now,

more so than in April, that this Court lacked, and continues to lack, jurisdiction to grant the Board's request to deny the fundamental right of the People to vote on the ballot initiative; that, even if we had such jurisdiction, it is a grave mistake to grant relief in the form of suspension of the franchise; and that it is particularly inappropriate to do so upon the request of an administrative agency which has no cognizable legal interest which is compromised in any manner by allowing voters to weigh in on a referendum. Therefore, I would vacate, as improvidently granted, the injunctive order of April 13 and I would dismiss the instant petitions for want of jurisdiction and let the People vote.

On the question of jurisdiction under the Gaming Act to enjoin an election at the behest of an administrative agency, Justice Saylor again dissents, articulating what I believe to be an unanswerable rebuttal to the Majority's claim that this Court has original appellate jurisdiction to abort any ballot initiative that poses a question that the Board feels could inconvenience it if answered a certain way. I therefore join in that part of Justice Saylor's dissent explaining why we lack jurisdiction under the Act.

In addition to joining Justice Saylor's dissent concerning jurisdiction under the Act, I write separately to address the Majority Opinion's suggestion, in *dicta*, that this Court has independent authority to cancel the vote and interfere in the legislative process in Philadelphia through a *sua sponte* assertion of King's Bench power, 42 Pa.C.S. § 502. *See* Maj. op. at 257–58 n. 6, 928 A.2d at 1264–65 n. 6. I also write to address certain substantive points in the Majority Opinion with which I respectfully disagree. Specifically, I would hold that: (1) even if this Court has jurisdiction over the Board's request to disenfranchise the citizens of Philadelphia, there is no justification for the Court's unnecessary, paternalistic and remarkable prior restraint of the franchise; and (2) the Board, a bureaucratic entity, lacks standing to seek to enjoin the right of the People to vote on a proposed change to their City Charter. Today's decision represents a dramatic departure

from this Court's respect for the democratic values underlying our system of government. Therefore, I am compelled to dissent.

## I. This Court Lacks Jurisdiction.

As an alternative to its claim that this Court has appellate jurisdiction under the Gaming Act to prohibit City officials from letting the citizens vote on the proposed referendum framed by City Council, the Majority declares, in a footnote, that "this matter also clearly merits invocation of our King's Bench powers" under Section 502 of the Judicial Code, 42 Pa.C.S., and *In re Avellino,* 547 Pa. 385, 690 A.2d 1138, 1140–41 (1997). The suggestion of this alternative basis for jurisdiction is gratuitous, since the Board never asked for relief under King's Bench.

In *Avellino,* this Court exercised its King's Bench power to resolve a dispute arising from the First Judicial District, where a judge of the Court of Common Pleas of Philadelphia County had refused to honor an assignment made by the Administrative Judge of the Trial Division.[1] The *Avellino* Court explained the difference in this Court's power of extraordinary jurisdiction, 42 Pa.C.S. § 726, and its King's Bench powers:

Although in many respects an exercise of the Court's King's Bench powers is to the same effect as an exercise of extraordinary jurisdiction under 42 Pa.C.S. § 726, the two are not identical. Extraordinary jurisdiction under section 726 enables the Court to assume plenary jurisdiction of a matter pending before a court or district justice at any stage. The King's Bench powers are not so limited. The **"power of general superintendency over inferior tribunals,"** may be exercised where no matter is pending in a lower court. Cf. *President Judge Determination Cases,* 420 Pa. 243, 216 A.2d 326 (1966) (King's Bench powers invoked to determine priority of commission of common pleas court

1. *Avellino* came to the Court upon a Petition from the Administrative Judge and the President Judge of the First Judicial District, apprising the Court of the judicial dispute below; in response to the Petition, we issued a Rule to Show Cause.

judges). We therefore reject Judge Avellino's argument that this Court cannot take cognizance of the dispute because the subject matter does not fall within our statutory original jurisdiction, there is no final order as to which we can exercise appellate jurisdiction, and there is no "case" pending as to which we can assume extraordinary jurisdiction.

690 A.2d at 1140–41 (emphasis supplied). This Court further addressed the nature of its King's Bench powers in *In re Franciscus*, 471 Pa. 53, 369 A.2d 1190 (1977), which involved a challenge to this Court's authority to issue Writs of Prohibition, writs which may only be issued to lower tribunals:

The Supreme Court's inherent power over the inferior courts and judicial officers can be traced historically. In *Carpentertown Coal & Coke Co. v. Laird*, 360 Pa. 94, 99–100, 61 A.2d 426, 428–29 (1948), the Court sketched the history of this Court's superintendency powers:

"It is suggested by the Turnpike Commission that although this Court has assumed the power to issue writs of prohibition the question as to its constitutional right so to do has not heretofore been challenged or discussed. Be that as it may, the justification for the Court's exercise of such power is to be found in the Act of May 22, 1722, 1 Sm.L. 131, 140, section XIII, which vested in the Supreme Court all the jurisdictions and powers of the three superior courts at Westminster, namely, the King's Bench, the Common Pleas and the Exchequer. **Inherent in the Court of King's Bench was the power of general superintendency over inferior tribunals,** a power which was of ancient inception and recognized by the common law from its very beginnings. Blackstone says, Book III, *42: 'The jurisdiction of this court (of King's Bench) is very high and transcendent. **It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below.'** By the Act of 1722 the Supreme Court of Pennsylvania was placed in the same relation to all inferior jurisdictions that the King's

Bench in England occupied, and thus **the power of superintendency over inferior tribunals became vested in this Court from the time of its creation:** *Commonwealth v. Ickhoff,* 33 Pa. 80, 81; *Chase v. Miller,* 41 Pa. 403, 411. In the exercise of its **supervisory powers over subordinate tribunals** the Court of King's Bench employed the writ of prohibition and such right and practice accordingly passed to the Supreme Court; *First Congressional District Election,* 295 Pa. 1, 13, 144 A. 735, 739; *McNair's Petition,* 324 Pa. 48, 64, 187 A. 498, 505. The provision of the Constitution limiting the original jurisdiction of the Court did not affect the existence of this right; the Constitution did not remove from the Court **its supervisory functions over lower courts.... The power of controlling the action of inferior courts** is so general and comprehensive that it has never been limited by prescribed forms of procedure or by the particular nature of the writs employed for its exercise."

369 A.2d at 1192–93 (1977) (emphases supplied) (further citations and footnote omitted).

The exercise of King's Bench in *Avellino* obviously was appropriate; it involved a supervisory issue concerning judicial officers of an inferior tribunal. But, this Court does not have such a supervisory role *vis a vis* the actions of the Philadelphia City Council, or any other legislative body. City Council is not a tribunal, much less is it an inferior tribunal subject to the superintendency of this Court. Nor is the Philadelphia County Board of Elections a tribunal answerable to this Court. The Court's explanation for claiming that King's Bench jurisdiction is appropriate in the case *sub judice* rests upon solipsism: "we have authority to act because we say we have the authority to act."

The Majority's *dictum* represents a troubling arrogation of power. The fact that the Gaming Board's displeasure with Council's preliminary legislative action is, in the Court's view, a matter of "widespread importance, and one that has generated ... substantial public concern" does not, on its own, explain why King's Bench authority is any more appropriate here than

it would be to call in team officials of the Philadelphia Eagles and the Pittsburgh Steelers to explain their draft selections. There is no judicial supervisory issue here, as the Board elected to seek injunctive relief directly in this Court. The "dispute" the "aggrieved" Board created here is properly reviewable or appealable in no court at this time; properly reviewable or appealable to this Court by statute; or properly reviewable or appealable by statute in some other court inferior to this one, a court the Board chose to bypass. If the Majority believes the circumstance presented involves the latter scenario, or if it prefers that route as a way to back away from the patent jurisdictional error it made on April 13, it should identify that court and the basis for its jurisdiction, and then explain why it would ignore the parties' jurisdictional arguments, perceive an issue of judicial supervision or administration, and *sua sponte* assume jurisdiction rather than transferring the matter to the court which should hear the "important" case in the first instance.

Beyond the question of whether this Court properly **has** the power to invoke King's Bench jurisdiction in this instance is the equally important question of **whether** it should do so. The Board does not seek King's Bench review. As the case presents itself—given the Board's litigation strategy of filing directly here—there is no issue of judicial superintendency. The extraordinary anti-democratic relief sought—enjoining the vote of the citizens—likewise should weigh heavily against the Court becoming the Board's supplemental advocate and creating a jurisdictional end-around to advance the Board's objectives. Finally, the "harm" alleged by the Board has nothing to do with its cognizable bureaucratic "interests," but at best is political, and that alleged harm is a mere piffle compared to the fundamental, extraordinary harm the agency seeks to visit upon the voters of Philadelphia by depriving them of the franchise. I would not torture King's Bench jurisdiction just because the case involves a statute, an agency decision, and a ballot question, which are important or controversial, or even both.

The final point to be made respecting jurisdiction is that this is a peculiar case in which to reach out and find review authority. The Majority purports to engage in a plain meaning construction of Section 1506 of the Act. But, that construction is implausible, and not only for the reasons articulated by Justice Saylor in dissent. The Act speaks of appealing "final" decisions. The ordinance and referendum here are but a stage in the Philadelphia legislative process. The ordinance merely places a charter change question on the ballot; the City Charter would actually be amended if, and only if, the electorate responded in the affirmative. Until the People have spoken, there is no relevant final "order, determination or decision" at issue, under any plausible plain meaning approach. No doubt, the obvious absence of a final decision is what leads to the Majority's repeated mischaracterization of the ballot question as giving Philadelphia voters an opportunity to override the Board's licensing decisions. The actual ballot question, as phrased by Council, says no such thing. The ballot question does not even address the Board, its powers, or its licensing decisions; if adopted, it would apply only to Council which, unlike the Board, is answerable to the people of Philadelphia.

The Majority's torturing of the statute does not stop there. Despite its insistence that the plain meaning of the statute commands its conclusion that the Board may air any political or trivial grievance directly in this Court, the Majority adverts to extraneous interpretative points, such as the statute's overall purpose to facilitate the hasty implementation of gaming. In a particularly revealing passage, the Majority invokes another principle of construction and claims that it would be "absurd" to conclude that the General Assembly would allocate direct review jurisdiction over licensing appeals and constitutional challenges to this Court, but not also require direct review of injunctive challenges to ordinances approving ballot questions which, if answered a certain way, **might** (and only might) then "impact on" the decision of the Board's licensing decisions concerning Philadelphia casinos. Maj. op. at 1263–64. To the contrary, it is not at all absurd to conclude

that the General Assembly simply did not contemplate burdening this Court with appeals from local ordinances that would merely place ballot questions involving casino zoning before the electorate. Questions of constitutionality and ultimate licensing are the most important of questions under the Act. Questions involving the Board's attempt to interfere in local legislative processes, and to deny the people a right to vote upon proposed changes to local charters, no doubt, simply were not contemplated. The Gaming Act creates enough of a burden upon this Court, requiring direct review of constitutional challenges and licensing decisions. I would not torture the statute, the plain meaning of words such as "appeal" and "final determination," and the actual content of the ballot question at issue, to pretend that the statute places these sorts of injunctive "appeals," which seek to suspend the franchise, in this Court as well.

The Majority should vacate the April 13 preliminary injunction as having been improvidently entered, dismiss the petitions for want of jurisdiction, and let the People vote.

## II. Injunctive Relief, in the Form of Negating the Franchise, is Inappropriate.

The Court's *per curiam* grant of preliminary injunctive relief on April 13 was unaccompanied by explanation or supporting citation. Today's Majority Opinion likewise does not discuss the **propriety** of relief in the form of aborting the vote on the ballot question, rather than consigning the Board (or the licensees, the truly "interested" parties) to legal relief, in the ordinary course, following a vote on the initiative. Neither preliminary nor permanent injunctive relief is justifiable particularly where, as here, the relief involves suppression of the Peoples' right to vote.

A preliminary injunction properly may issue only when six essential prerequisites are established. As this Court noted in *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 828 A.2d 995 (2003):

In ruling on a preliminary injunction request, a trial court has "apparently reasonable grounds" for its denial of relief

where it properly finds that any one of the following "essential prerequisites" for a preliminary injunction is not satisfied. *See Maritrans GP, [Inc. v. Pepper, Hamilton & Scheetz,]* 529 Pa. 241, 602 A.2d [1277,] 1282–83 [ (Pa.1992) ] (requirements for preliminary injunction are "essential prerequisites"); *County of Allegheny v. Commonwealth,* 518 Pa. 556, 544 A.2d 1305, 1307 (1988) ("For a preliminary injunction to issue, every one of the [ ] prerequisites must be established; if the petitioner fails to establish any one of them, there is no need to address the others."). First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages.... Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings.... Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct.... Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits.... Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity.... Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

828 A.2d at 1001 (supporting citations omitted). The test for a permanent injunction is simpler, but still requires a showing of harm that cannot adequately be addressed in the ordinary course by an action at law:

[I]n order to establish a claim for a permanent injunction, the party must establish his or her clear right to relief.... However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court "may issue a final injunction if such

relief is necessary to prevent a legal wrong for which there is no adequate redress at law." . . .

*Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659, 663–64 (2002), *cert. denied,* 540 U.S. 821, 124 S.Ct. 134, 157 L.Ed.2d 41 (2003) (citations omitted). Notably, in its discussion of the procedural history of this matter, the Majority cites to Chief Justice Cappy's opinion in the *Buffalo Township* case, notes that a permanent injunction is available if the Board establishes a clear right to relief, but then omits the requirement that the moving party show that injunctive relief is necessary because there is no adequate remedy at law. In my view, the Board has not come close to carrying its burden of showing that the ballot question at issue posed (and poses) such an immediate and otherwise irremediable harm to the Board that it is entitled to deprive Philadelphia voters of the right to pass upon the measure.

There is no possible justification for the Court's initial order under preliminary injunction standards, which may explain the Court's silence on that point, and its permanent order likewise ignores the governing standard. It cannot seriously be maintained that there was an "immediate" and "irreparable" harm to the Board's "interests" posed by the primary ballot question. Respecting immediacy, I cannot discern what harm the Board would suffer (assuming a bureaucracy can be said to suffer cognizable harm in this area, but more on that later). Any harm was entirely contingent. Harm allegedly would arise **if** the electorate's right to vote had not been suspended by the Court, **if** a majority of Philadelphia voters then voted in favor of the Charter change, and **if** the City Council then acted on that change. The harm consisted in the alleged fact that implementation of the Board's licensing decisions might then be affected in some vague way. I say vague because, according to the Board and the Majority, all the power is with the Board, so any action of Council would be a nullity. Null acts tend to cause little harm. This is hardly an immediate harm warranting suspension of the vote on a legislative referendum.

Nor is the conjectured harm irreparable, if the word irreparable is to be accorded its ordinary meaning. If all of the contingencies the Board fears came to pass, the Board, or some party with a true "interest" in the matter (the successful license applicants) could seek relief after the vote, and after the alleged harm materialized. Since both the Board and the Majority feel that the Board has "sole authority" in this area, relief in the ordinary course is more than sufficient to vindicate the Board's alleged interest—all without taking the extraordinary step of sacrificing the People's sacred franchise. It would require sophistry of the highest and most disingenuous order to suggest that the **public** interest is **more** harmed by denial of the injunction than by granting it, or to suggest that it is a greater injury for the Board to have to await actual harm to seek relief than it is to suspend the right to vote in Philadelphia.

Notably, the Office of the City Solicitor, which has filed a very helpful brief on behalf of the City and the Board of Elections, agrees with the Board and with the Majority (in its merits analysis) that the proposed City Charter amendment, if adopted by the voters, would prove to be a nullity, given the breadth of the Gaming Act legislation. As the Solicitor correctly notes, however, that contingent possibility is no reason to deny the right to vote upon the legislative ballot measure, and the Board's remedy should await the contingency and attenuated harm (if any) it posits. In more pointed terms, the City Council respondents characterize this Court's April 13, 2007 injunction as "a fundamentally anti-democratic act directly inconsistent with the traditions of the Commonwealth, of our Nation, and indeed of any civilized democratic polity. *E.g., Mt. Lebanon v. County Bd. of Elections of the County of Allegheny,* 470 Pa. 317, 368 A.2d 648, 649 (1977). The role of our courts is to evaluate the statutes produced by the electoral and legislative process. It is not the place of our courts to intervene before that process is complete." City Council Brief, 3. It pains me to say that this characterization of our order is accurate.

The Board simply cannot be said to suffer any kind of cognizable legal harm by the Philadelphia electorate merely voting on the referendum. First of all, the voters could reject the referendum. The Mayor, many unions, and other groups openly favor gaming in Philadelphia. Even if a majority of the voters were to approve the Charter change, the referendum merely says that Council cannot affirmatively act to permit licensed gaming in certain zones. But, the Board's merits argument, which the Majority is quick to embrace, says it does not need Council's approval or cooperation at all. If the Board is correct, as the Majority says it is, then I cannot perceive how an irrelevant non-action, or even an affirmative non-approval by an entity with no say in approvals, affects the Board's licensing decisions, much less its "authority." How can it harm the Board, a mere agency, to an extent that suspension of the right to vote on a proposed Charter change is justified?

There is little doubt that the referendum was a political ploy on Council's part, nor do I doubt that it raised false hopes in some voters. But, that is no reason to deny the vote. No doubt, the daily business of the Board would be easier if Philadelphia voters were denied the opportunity to voice their dissent, or their concurrence, with the contours of gaming in Philadelphia. No doubt, the Board would prefer not to be the subject of public criticism. However, as Council notes, "[t]he desire of [the Board] to avoid the embarrassment of a public rebuke by Philadelphia voters is understandable enough, but it hardly affords a basis for the extraordinary relief sought." City Council Brief, 8. Welcome to the brave new world of government in a democracy. Memo to Board: criticism is part of the job. If the Board is correct on the merits of its power, by definition, neither it nor the casinos it licensed can be said to suffer any harm which would warrant extinguishing the right of citizens "to express their views about governmental actions that affect them profoundly." *Id.*

The Majority repeatedly declares, as if it were a self-evident truth, that the General Assembly did not confer upon the citizens of Philadelphia a right to vote upon a Charter change

referendum involving the role their local government should play in accommodating state-ordained casinos in Philadelphia. By what authority do the voting rights of the Philadelphia citizenry, concerning their local representatives and the contours of their local Charter, depend upon such assumed silent whims as perceived by the Majority? The Majority seems to believe that if the General Assembly legislates in an area, it thereby implicitly, and lawfully, denies citizens of an affected political subdivision from voting on any measure involving the subject matter. This is an extraordinary, and extraordinarily dangerous, assumption in a democracy. Statewide legislation may occupy a field, it may displace a local expression, it may disapprove a local expression, but how can it operate to deprive the citizenry of the right to even pass upon a subject? If a local law, once actually enacted, proves to be unconstitutional, or to be inconsistent with some greater authority, there is time enough to remedy the matter in the ordinary course, after the law has been voted on and approved, and after considered deliberation.

Moreover, the curious view of democracy which powers the Majority's analysis of the right to vote seriously mischaracterizes the content of the referendum at issue. Again, the ballot question does not purport to tell the General Assembly or the Board what to do. The measure is purely local, aimed at the citizens' local representatives. If adopted, the referendum would approve a Charter change which would restrain Council, not the Board or the General Assembly. It is one thing for a locality to acquiesce in, or to knuckle under to, state-imposed decisions with which the subdivision might disagree. It is quite another to warmly embrace and go the extra mile to advance the state-imposed directive. The Majority's notion that expressions of restraint and dissent have no role in democracy in Pennsylvania is a strange one, indeed.

No candid consideration of the issues presented in this case can be accomplished without acknowledging that the introduction of gaming into Pennsylvania has been controversial. The manner in which the legislation was adopted afforded the average voter, including the people most likely to be affected

by the siting of the casinos, scant opportunity to engage in a meaningful public debate. It is no surprise, then, that implementation of the Act has led to outspoken and organized community opposition in Philadelphia, opposition which powered Council's adoption of the ballot referendum at issue.

Philadelphia is not Las Vegas. It is the birthplace of our Nation, a vibrant, historic City where the past and present coexist. The provision in the Act requiring a certain distance from existing slots facilities (as relevant here, the "racinos" in Chester, Delaware County, and in Bensalem, Bucks County) obviously was designed to maximize the chances that the two casinos allocated to Philadelphia would be sited on the historic Delaware River waterfront, the same waterfront that William Penn first saw over three hundred years ago, the same waterfront Benjamin Franklin first saw as a seventeen year-old some forty years later, the same waterfront that borders a number of historic Philadelphia neighborhoods.[2] The sites ultimately approved by the Board are within easy walking or driving distance of Independence Hall and Square, the Liberty Bell, Carpenters' Hall, Christ Church, Elfreth's Alley, Gloria Dei Church, and other historic sites.

The approved remaking of the Philadelphia waterfront is extraordinary. Imagine gaming halls being placed this close to the U.S. Capitol or the White House, or as near to Faneuil Hall in Boston. Aside from the fact that the people of Philadelphia had no opportunity to participate in a public debate on the specifics of the legislation ultimately adopted by the General Assembly, the people in the historic neighborhoods most affected by the approved casinos had a very limited say before the Board, which was charged only to abide by the Assembly's guidelines, and which went about its licensing duty with alacrity. To add insult to this injury, this Court, over the dissent of Justice Saylor and this author, denied various neighborhood groups "standing" to be heard in connection with the licensing decisions. *See, e.g., Society Hill*

---

**2.** The only Philadelphia casino applicant whose site was not on the Delaware River, Trumpstreet, found its application rejected, in large part, because of its location.

*Civic Assn. et al. v. Pennsylvania Gaming Control Bd.*, 593
Pa. 1, 928 A.2d 175 (2007).

And so, the neighbors directly affected by the licensing
decisions were successfully muzzled before the General As-
sembly, muted before the Board, and totally muzzled before
this Court. It is not surprising that the affected citizens
pursued a parallel track through City Council, which did
respond to their complaints, even if the response is legally
meaningless. The referendum, whether adopted or not, allows
for an expression of view by Philadelphia voters concerning
where casinos should be sited in their historic City. The
referendum, if adopted, would keep Council from acting to
facilitate gaming under some circumstances and in certain
neighborhoods. By what authority, consistent with the found-
ing principles of our Nation, does the Court enjoin a vote by
the citizens of Philadelphia concerning the role its **Council**
should play in facilitating zoning for casinos? There simply is
none. The Court's unnecessary restraint on democracy makes
this a sad day, indeed.

I am reminded of the words of the loquacious Pennsylvania
Supreme Court Justice Michael Musmanno, in a case involving
a very similar issue arising out of a proposed Charter change
in Philadelphia half a century ago:

> If the decision handed down today in this case had been
> promulgated behind the Iron Curtain it might well have
> been characterized as an illustration of the absolutism which
> can deprive the people of a voice in their government. The
> majority of this Court says that the people of Philadelphia
> are not qualified to pass upon two simple questions submit-
> ted to them by their own duly elected representatives, but
> the majority fails to state why the people are to be disfran-
> chised on a matter involving their own government....
>
> The plaintiffs who have sought and obtained an injunction
> against the submission of these questions to the people quite
> clearly desire that both questions [that would have been
> posed] be answered in the negative. If the changes contem-
> plated in the question are bad for the people they would
> certainly vote them down, and the resulting vote would

therefore achieve the result intended by the plaintiffs. If they are good for the people, the people would vote in the affirmative. The plaintiffs have blocked the proposed referendum out of fear that the people might approve the amendments because, obviously, if they believed the people would reject the amendments, they (the plaintiffs) would have [saved] themselves the expense, time, energy and work involved in initiating this litigation. In that aspect of the case, it is pertinent to inquire on what pedestal do the plaintiffs stand that they can presume to determine what is good and what is bad for the people.

The right of the people to decide any question which affects their welfare is a right enshrined in the [C]onstitution of the United States, the Constitution of the State of Pennsylvania, and, so far as Philadelphia is concerned, in the Home Rule Charter itself.

* * * *

The lower Court declined to allow the people to pass upon the submitted questions not because of any parliamentary defect in the passage of the ordinance, but because it believed that it knew better than Council what was best for the City. But the Charter did not make of Court of Common Pleas ... an upper chamber to the Philadelphia City Council. Court of Common Pleas ... has no legislative powers whatsoever.

*Schultz v. City of Philadelphia*, 385 Pa. 79, 122 A.2d 279, 287–88 (1956) (Musmanno, J., dissenting). Nor is this Court an upper chamber of Philadelphia City Council, and we do not possess legislative power. We should decline to advance the Board's attempt to stifle the possibility of Philadelphia voters expressing their views—views which the Majority recognizes would be a nullity anyway—on the siting of casinos in their historic city.

Although Justice Musmanno was in dissent in *Schultz*, his views are significant not only because of the inerrant logic of his position but also because, in the *Mt. Lebanon* case, this Court expressly rejected the plurality approach in *Schultz* to

which that dissent responded, and instead adopted the separate *Schultz* dissent of Justice Charles Alvin Jones. Because *Mt. Lebanon* obviously controls the case *sub judice*, and because the majority mischaracterizes the case, I quote its analysis at length:

> Legislative power has been defined as the power to make, alter, and repeal laws.... Furthermore, the courts may not encroach on the legislature's powers.... **As an amendment to a home rule charter has the force and status of a legislative enactment, ... the courts should not interfere.** As Justice (later Chief Justice) Charles Alvin Jones stated, in his dissenting opinion in *Schultz v. Philadelphia*, 385 Pa. 79, 89–90, 122 A.2d 279, 284 (1956):
>
>> "The jurisdiction of a court of equity may not be invoked to enjoin the enactment of a bill during the course of its passage through a legislative body. Such is the preponderant weight of authority throughout this Country and I say that without fear of successful contradiction.... Would anyone have the temerity to suggest that the Court of Common Pleas of Dauphin County, sitting in equity, would extend its jurisdiction to a complainant who sought to enjoin the enactment of a bill during its passage through the legislature even though it was conceded on all sides that the bill, if passed, would be a gross and palpable violation of the Constitution?"
>
> As this court stated in *Cali v. Philadelphia*, 406 Pa. 290, 312, 177 A.2d 824, 835 (1962):
>
>> "... it is too often forgotten that under our basic form and system of Constitutional Government the power and duty of a Supreme Court is interpretative, not legislative. We are not a Supreme, or even a Superior Legislature, and we have no power to redraw the Constitution or to rewrite Legislative Acts or Charters, desirable as that sometimes would be."
>
> Furthermore, this court should not offer advisory opinions during the deliberative stages of the legislative process.
>
> In *Knup v. Philadelphia*, 386 Pa. 350, 353, 126 A.2d 399, 400 (1956), this court stated:

" ... it is equally well established that a court will take jurisdiction only in a case in which a challenged statute, ordinance, or rule of court has been actually applied to a litigant; it does not undertake to decide academically the unconstitutionality or other alleged invalidity of legislation until it is brought into operation so as to impinge upon the rights of some person or persons."

... In the instant case, there was only proposed legislation which, until enacted, affected no one. The instant action was an attempt to obtain an advisory opinion.

*Mt. Lebanon*, 368 A.2d at 649–50 (emphases supplied) (citations omitted).

The *Mt. Lebanon* Court went on specifically to disapprove of the plurality opinion in *Schultz*, to the extent that plurality deemed it proper to opine upon the constitutionality of proposed amendments to the Philadelphia Home Rule Charter prior to their adoption. The Court disapproved of that proposition because: (1) it was "pure dictum," since the ballot measure independently failed for procedural reasons; (2) it was a non-binding plurality expression; and (3) "it 'attempts to allow unwarranted judicial interference with the legislative process ... [which] conflicts with sound constitutional principles and two centuries of case law of this court.' " 368 A.2d at 650–51.

Respondents specifically invoke *Mt. Lebanon*. The Majority responds only briefly, attempting to distinguish the case on grounds that its decision here, supposedly, is neither "theoretical nor abstract" because the vote is "as much a concern to the Board ... as is the outcome of the vote." Even laying aside the strange notion that a party's "concern" makes an advisory opinion appropriate, this "distinction" is distressingly non-responsive to the holding and reasoning in *Mt. Lebanon*, which I have been careful to present in its fullness above. *Mt. Lebanon* spoke not only to avoiding advisory opinions, but also, and more fundamentally, to the limits of judicial power when asked to interfere in the legislative process. The Majority enjoins a vote by the citizens on a proposed change to their

City Charter. *Mt. Lebanon* expressly stated that such amendments have "the force and status of a legislative enactment, [and thus] the courts should not interfere." The ordinance that would result from a positive vote on the referendum has not come into being, much less has it "been actually applied to a litigant." At this point, there is only "proposed legislation which, until enacted, affected no one." The Majority's grant of relief here indisputably is "an unwarranted judicial interference with the legislative process," which ignores centuries of precedent, the doctrine of the separation of powers, and represents a *sub silentio* overruling of the *Mt. Lebanon* case.

In place of the plainly-controlling decision in *Mt. Lebanon,* the Majority cites and incompletely characterizes the decision in *Deer Creek Drainage Basin Auth. v. County Bd. of Elections of Allegheny Co.,* 475 Pa. 491, 381 A.2d 103 (1977). One need only read the third sentence of that case to see that it has no applicability here: "Under the [home rule] charter [at issue], upon the filing with the Board of Elections of Allegheny County of a proper referendum petition, **any ordinance which is the subject of such an election is suspended.**" *Id.* at 104 (emphasis supplied). Moreover, the ordinance automatically suspended by the referendum petition in *Deer Creek* had initiated the existence of a multi-township, joint water authority; thus, the referendum by its existence effected an unlawful withdrawal from the joint authority. The *Deer Creek* majority detailed at some length the very real harm to actual parties that resulted from the very existence of the referendum:

> This referendum election has raised doubts about the continuing vitality of the Deer Creek Drainage Basin Authority. Not only the possible repeal but also the mere suspension of this ordinance, by operation of the West Deer home rule charter, has hindered the ability of the joint Authority and the Townships to stabilize the cost of this sewage project. The joint Authority has been frustrated in its effort to begin the operation of the project, and both West Deer and

Indiana Townships have been unable to meet their sewage disposal needs.

475 Pa. 491, 381 A.2d at 107 (1977).

In contrast, the ballot referendum in the case *sub judice* does not, by its very existence, operate to suspend any statute or ordinance, much less does it affect any action of the Board. Again, the referendum only addresses Council's authority, an authority the Board and the Majority insist is a legal nullity. The fact that the Majority ignores this fundamental distinction does not make it go away. Moreover, it is notable that *Deer Creek* was decided later in the same year as *Mt. Lebanon,* yet the Court but did not even cite, much less did it purport to overrule, that case. *Deer Creek* does not remotely support the Majority's suppression of the vote here.[3] The Majority should respect the limitations upon this Court's power to interfere with the legislative process.

### III. The Board Lacks Standing to Demand Suppression of the Vote.

The Majority remarkably finds that the Board, an administrative entity, has a "substantial, direct, and immediate interest" in the referendum, such that it has standing to seek to prevent the People from voting on the measure. I respectfully disagree with the Court's embrace of what amounts to bureaucratic standing.

The Board's role, as relevant here, was to investigate, deliberate, and award the two Philadelphia casino licenses authorized by the Gaming Act. In so doing, the Board passed upon the applications of real parties in interest: the license applicants. The Board awarded the two Philadelphia licenses, resulting in two winning parties and three losing parties. One

**3.** In any event, I would be very careful before expanding whatever general rule can be said to emerge from *Deer Creek*, since there is a serious question whether the Court had jurisdiction to grant the relief it ordered, and it seems obvious that avoidance of the immediate harm played a substantial role in the Court bypassing the jurisdictional issue. The difficulties are outlined in the Dissenting Opinion of Mr. Justice Pomeroy, difficulties the *Deer Creek* majority made no attempt to resolve. *See id.* at 108–114.

of the unsuccessful Philadelphia license applicants appealed. On that appeal, the Board justified its decision to conduct its deliberations in private, in the face of a Sunshine Act claim, *see* 65 Pa.C.S. § 704, by arguing that its licensing decisions were quasi-judicial. *Riverwalk Casino, LP v. Pennsylvania Gaming Control Bd.*, 592 Pa. 505, 518–19, 926 A.2d 926, 934 (2007). The Board thus conceives itself, for purposes of its licensing decisions at least, as a quintessential **disinterested** entity.

In finding that the Board has standing to come into this Court and demand that the People of Philadelphia be denied their right to vote upon a referendum that would effect a zoning change to their City Charter, the Majority credits the Board's argument that a mere vote on the referendum acts to "thwart[ ] the exercise of its statutory duty and authority under the Gaming Act." Maj. op. at 259, 928 A.2d at 1266. Respectfully, this is nonsense. The Board completed the exercise of its relevant "duty and authority" when it awarded the licenses. The vote on the referendum has no effect on those decisions. More importantly, if the well-heeled, successful applicants encounter difficulties thereafter, they are more than positioned to litigate their **actual** interests in seeing to it that the facilities so licensed come into being. Indeed, the successful applicants already are doing so with additional lawsuits filed here. But, the **Board** has no cognizable legal interest—much less a substantial, direct, and immediate interest—in what occurs after it has discharged its licensing duty. Furthermore, even if I were to indulge the Majority's paternalistic fiction that the Board has a cognizable interest in vindicating its licensing decisions, a vote on the referendum simply does not operate to "thwart" those decisions. The ballot question is directed at Council and, as I have noted, the Board claims, and the Majority finds, that Council's view on the siting of the casinos is a nullity.

The Majority also declares that the Board has a cognizable "substantial, direct, and immediate" interest in seeing to it that its licensing decisions are not overturned. Maj. op. at 259, 928 A.2d at 1266. This is a very curious assertion. Are

we to believe that all entities rendering judicial, or quasi-judicial, decisions have a cognizable "interest" in having their decisions vindicated, such that they may initiate collateral lawsuits designed to defend their rulings? Does such "bureaucratic standing" really extend so far as to embrace petitions designed to abort local ballot questions because, if the vote goes a certain way, it may somehow "affect" the "quasi-judicial" decision? Under the Majority's curious theory, I suppose, trial judges now have "standing" to seek to enjoin elections that might threaten the viability of their rulings in a particular case or controversy.

Respectfully, the Majority needs to step back from its accommodationist approach to the gaming appeals. At least with respect to licensing decisions, the Board can only rationally be viewed as a neutral entity, not a "party" with a proper and cognizable "interest" in the licensing decisions it renders. Strictly speaking, the Board has no interest beyond that of the citizens of Pennsylvania who empowered it. It has no more "interest" in the litigation than this Court does. It is particularly bizarre to conclude otherwise when there are actual interested parties, *i.e.*, the license applicants. I would not recognize bureaucracy standing just because the Board invokes different roles (now agency, now quasi-judicial, now aggrieved litigant), at different times. The fact that the Board has a **position** on the ballot measure (it inconveniences the Board) does not mean it has a cognizable **legal** interest in it. The Board's interest is similar to that of an amicus curiae; but it hardly has the substantial, direct and immediate interest required to establish **party** standing, such that it can properly pursue an action to kill a ballot measure.

What the Board seeks to do in this case is to eliminate the prospect that the citizens of Philadelphia will express opposition to casino gambling near to their residences and "residentially related" properties. Suppression of the vote may well be a political concern for the Board, but it is not a cognizable legal "interest" sufficient to establish standing. Why should the Board, unlike all other governmental entities, be deemed immune from the opinion of the citizenry and the ordinary processes of government and litigation? As an arm of govern-

ment, the Board should not be encouraged to seek to suppress the views of the public as expressed in the legislative process.

Finally, it is beyond ironic that the Court finds that a bureaucratic entity has standing to seek to suppress the vote of the citizens of Philadelphia on a matter concerning gaming, while finding, in other cases, that citizens themselves living in the very neighborhoods affected by the awarding of casino licenses have no stake in the licensing appeals. Thus, the citizens of Philadelphia cannot be permitted to so much as voice their opinion on the location of gaming facilities in Philadelphia, but the fictional "person" which is the Board, we are to believe, possesses a "substantial, direct and immediate interest" in the licensing decisions, an interest so strong that it defeats the franchise and the ordinary legislative process. This is perverse: Bureaucracy has a "right" to be heard; the People do not. I would reverse the Majority's skewed priorities and let the People vote!

## *IV. Conclusion.*

I urge my colleagues in the Majority to reconsider the improvident order entered on April 13, to respect the limits upon this Court's power, to respect the primacy of the franchise, and to rethink their acceptance of the extreme positions forwarded by the Board, which has no legitimate stake in this matter. I urge the Court to void its historic error and to let the People vote. Failing to convince my colleagues of their fundamental error, I content myself with this dissent which, I trust, a future Court will vindicate.

Justice SAYLOR, dissenting.

On the threshold jurisdictional issue addressed in Part II of the majority opinion, I maintain the position that Section 1506 of the Gaming Act, 4 Pa.C.S. § 1506, does not extend to original jurisdiction matters.[1] A challenge in the courts to a

1. This position was previously developed in my dissenting statement, joined by Mr. Justice Castille, to the Court's April 13, 2007, Order granting the Gaming Control Board's request for a preliminary injunction.

legislative act, such as the Philadelphia ordinance presently at issue, is conventionally understood to represent an original jurisdiction matter, *see, e.g., Devlin v. City of Philadelphia,* 580 Pa. 564, 862 A.2d 1234 (2004); whereas Section 1506 is explicitly addressed to this Court's "appellate jurisdiction," 4 Pa.C.S. § 1506.[2] In so addressing Section 1506, I simply do not believe that the Legislature contemplated the radical alteration to conventional practice that is reflected in the majority opinion. Had the Legislature designed the statute to extend its reach to classic original jurisdiction matters, it readily could have utilized the applicable terminology.

My response to the majority's policy assessment, *see* Majority Opinion, *op.* at 256–58, 928 A.2d at 1264–65, as set forth in my previous dissenting statement, remains as follows:

I recognize that, had the General Assembly foreseen the present circumstances, it might very well have drafted Section 1506 more broadly. Nevertheless, our approach to statutory construction is to apply the plain terms of an enactment when they are clear, *see, e.g., Commonwealth v. McClintic,* 589 Pa. 465, 472–73, 909 A.2d 1241, 1245 (Pa. 2006), as I believe they are here. Moreover, investing a State Supreme Court, which generally functions in an appellate capacity, with exclusive responsibility for original jurisdiction matters is a reordering of great consequence to both the Court (in terms of resources and procedures) and the litigants, which I believe should occur only upon very clear and deliberate terms.

**2.** Highlighting the difference between appellate and original jurisdiction matters, our Rules of Appellate Procedure pertaining to review of governmental determinations are framed around this distinction. *See* Pa.R.A.P. 1511–1561 (distinguishing between appellate and original jurisdiction petitions for review in terms of filing deadlines, content, other pleadings allowed, intervention, scope of review, and disposition); Pa.R.A.P. 1501, Note ("[T]he rules have been amended to more clearly separate procedures for appellate proceedings from those applicable to original jurisdiction proceedings"). *See generally* G. RONALD DARLINGTON, KEVIN J. McKEON, DANIEL R. SCHUCKERS, AND KRISTEN W. BROWN, PENNSYLVANIA APPELLATE PRACTICE § 1501:1 (elaborating on fundamental differences between appellate and original jurisdiction matters).

*Pennsylvania Gaming Control Bd. v. City Council of Philadelphia*, 593 Pa. 241, 928 A.2d 1255 (2007) (Saylor, J., dissenting, joined by Castille, J.).

The reasoning supporting each subsequent part of the majority opinion appears to me to depend integrally upon the majority's repeated assertion that "the General Assembly has given the Board the sole authority to locate licensed facilities in Philadelphia and did not give the City's electorate the right to consider or override that decision or to prevent the implementation of that decision under the City's laws." Majority Opinion, *op.* at 258, 928 A.2d at 1265; *see also id.* at 259, 261–65, 264–67, 928 A.2d at 1266, 1267-69, 1269–70. Clearly, this was the Legislature's design. However, in *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) ("*PAGE*"), this Court found that the General Assembly's attempt to effectuate this intent via the Gaming Act violated the non-delegation clause of the Pennsylvania Constitution, in the absence of more specific legislative standards by which the Board is to make such determinations. *See id.* at 334–35, 877 A.2d at 418–19. Although the Legislature subsequently amended the Gaming Act, it did nothing to supply the necessary "definitive standards, policies and limitations to guide [the Board's] decision-making with regard to zoning issues." *Id.* I do not follow the logic underlying the majority's position that amended Section 1506 serves this function or otherwise fills the void, *See* Majority Opinion, *op.* at 264–65, 928 A.2d at 1269, since the amendment supplies no standards, policies, or limitations to be applied by the Board in the location of gaming facilities; but rather, relates solely to judicial review.

My position concerning this matter remains that this Court should not have intervened to restrain the presentation to the Philadelphia electorate of the ballot question regarding the location of gaming facilities within the City, on either the jurisdictional or substantive grounds that have been developed by the majority thus far.

Finally, I recognize that there are additional grounds for relief asserted in the Gaming Control Board's petition for review, *see* Majority Opinion, *op.* at 267 n. 11, 928 A.2d at 1270

n. 11, including the claim that the ordinance represented an attempt to engage in constitutionally impermissible exclusionary zoning. To the extent that additional review is warranted,[3] I believe that those matters should be addressed by a court of appropriate jurisdiction, where necessary, in a fact-finding capacity. At this juncture, I would have no objection to the majority's indicated prerogative to invoke the Court's King's Bench powers, *see* Majority Opinion, *op.* at 257–58 n. 6, 928 A.2d at 1264–65 n. 6, to initiate this process.

**3.** As noted in my prior dissenting statement, I believe that this matter is technically moot since the ordinance was keyed to the May 15, 2007 primary. Although courts generally will not review controversies that have become moot, an exception exists where the circumstances are capable of repetition yet evading review. *See, e.g., Burger v. Board of School Directors of McGuffey Sch. Dist.,* 576 Pa. 574, 583, 839 A.2d 1055, 1060 (2003).