943 A.2d 955

## PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, L.P. d/b/a Foxwoods Casino Philadelphia, Petitioner,

v.

## CITY COUNCIL FOR the CITY OF PHILADELPHIA and The City of Philadelphia, Respondents.

Supreme Court of Pennsylvania.

Submitted March 14, 2008.

Decided April 2, 2008.

Michael Kenneth Coran, Esq., Glenn A. Weiner, Esq., Joseph Paul Bradica, Esq., Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P.; Eric G. Fikry, Esq., William G. Schwartz, Esq., Jeffrey Brent Rotwitt, Esq., Stephen David Schrier, Esq., Obermayer Rebmann Maxwell & Hippel, L.L.P.; LeRoy S. Zimmerman, Esq., Eckert Seamans Cherin & Mellott, L.L.C.; Keth Robert Lorenze, Esq., Philadelphia, for Philadelphia Entertainment and Development Partners L.P. d/b/a Foxwoods Casino Phila.

Richard Gerson Feder, Esq., Kelly Susan Diffily, Esq., City of Philadelphia Law Department, Romulo L. Diaz, Jr., Kevin M. Greenberg, Philadelphia, for The City of Philadelphia.

James W. Christie, III, Esq., Christie, Pabarue, Mortensen & Young, P.C., Philadelphia, for City Council for the City of Philadelphia.

CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, and McCAFFERY, JJ.

## OPINION

Chief Justice CASTILLE.

Before us today is a Verified Petition for Review and an Application for Summary Relief and Expedited Briefing Schedule filed by Philadelphia Entertainment and Development Partners, L.P. ("PEDP"). PEDP seeks to compel City Council for the City of Philadelphia and the City to comply with their statutory duties to implement the December 20, 2006 decision of the Pennsylvania Gaming Control Board awarding one of two Category 2 slot machine licenses in the City to PEDP pursuant to the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act" or "Act"), 4 Pa.C.S. § 1101 et seq.[1] We recently granted this same relief to HSP Gaming, L.P. ("HSP"), the other successful applicant for a Philadelphia Category 2 slot machine license. See HSP Gaming, L.P. v. City Council, 939 A.2d 273 (Pa.2007).

The Gaming Board has exclusive authority to determine the location of licensed slot machine facilities in, inter alia, the City of Philadelphia. 4 Pa.C.S. § 1304(b)(1). In anticipation of the Board's exercise of that authority, City Council had enacted Ordinance No. 051028–AA ("the Ordinance") on February 23, 2006, adding Chapter 14–400 to the provisions of the Philadelphia Code that govern zoning and planning. The Ordinance established a new zoning classification called Commercial Entertainment Districts ("CEDs"). As we noted in HSP, the Ordinance "was 'intended to encourage the orderly development of major entertainment facilities and certain other uses in accordance with an approved plan of development,' without interfering with the Gaming Board's approved

1. The Gaming Act established three distinct categories of slot machine licenses for which interested parties may apply. 4 Pa.C.S. § 1301. Under Section 1304 of the Act, the Board is directed to locate two Category 2–licensed facilities within a city of the first class (i.e., Philadelphia). 4 Pa.C.S. § 1304(b)(1). Upon issuance of a license by the Board "in its discretion," a successful applicant may place and operate slot machines at its licensed facility once constructed. 4 Pa.C.S. § 1301.

locations of the casinos." *HSP*, 939 A.2d at 275 (quoting § 14–401 of the Ordinance, Phila. Code § 14–401(1)). Accordingly, Section 14–405 of the Ordinance provides, in pertinent part, as follows:

### § 14–405. Use Regulations.

\* \* \* \*

(2) Nothing in this Chapter shall limit the right of the Pennsylvania Gaming Control Board under the [Gaming] Act to identify the property on which it will permit a Category 2 licensed gaming facility within the City.

(3) Nothing in this Chapter shall be construed to prohibit any use that is exclusively regulated and permitted by the Commonwealth under the [Gaming] Act.

Phila.Code § 14–405.

In *HSP*, we reviewed the procedures set forth by the Ordinance that must be followed before construction of a gaming facility may begin:

[First,] a plan of development is submitted to the Philadelphia Planning Commission for approval. After a plan of development is approved by the Planning Commission, it is submitted to Council. Council is to take two separate actions to designate a site for casino development: (1) designate by ordinance the site as a Commercial Entertainment District, and (2) review and approve a Plan of Development that has been submitted by the Planning Commission. Phila. Code § 14–403(1), (2). Once the CED designation becomes effective, the underlying zoning classifications for all lots within the district are superseded.

*HSP*, 939 A.2d at 275. The Ordinance requires that the plan of development include comprehensive information about the CED district.[2]

2. In particular, the plan of development must include the following information and details:

(a) The extent, boundaries, and area of the district to include lot area and width dimensions;

(b) The proposed maximum gross floor area;

On December 20, 2006, the Gaming Board awarded PEDP a Category 2 license to place and operate slot machines at a facility to be known as Foxwoods Casino and to be located on property that PEDP owns at 1449 South Christopher Columbus Boulevard in Philadelphia.[3] The Board's order and adjudication followed on February 1, 2007. Pursuant to Section 14–403 of the Ordinance, PEDP submitted its plan of development to the City Planning Commission on April 17, 2007.[4] On

(c) The dimensions and heights of the proposed structures or existing structures to be retained as well as the use or uses intended for such structure;

(d) The occupied area, gross floor area, and height of all buildings within the district;

(e) The size and location of all parking areas; the size and location of all driveways leading thereto; and the size and location of all other private drives, ways or streets intended to be used by automobile traffic;

(f) The size and location of all off-street loading facilities;

(g) The size and location of any signs;

(h) A landscaping plan;

(i) A transportation management plan that details internal circulation systems, external access points, pedestrian flows, including to and from parking facilities, and estimates of levels of service on sidewalks and internal roads. The plan shall include a traffic and parking study prepared by a licensed traffic engineer, assessing the impacts of new traffic generated by the proposal on roadway and intersection capacity, public transit and other bus operations, and pedestrian and bicycle circulation and safety;

(j) A parking management plan describing the proposed policy on and resources for parking for patrons, employees, and managers, and anticipated traffic and parking management resources;

(k) Any recommendations on intersection improvements, new roadway construction, or widening of existing roadways, if required, and any traffic buffers to protect residential areas, including the manner of funding such improvements by the developer;

(*l*) Any other information which the Commission may deem necessary, to include sufficient guarantees in the form of restrictive covenants running with the land or letters of intent for any lands to be dedicated for public use.

Phila.Code § 14–403(3).

3. The property extends eastward to the Delaware River and is bounded by Reed Street to the north and Tasker Street to the south.

4. In the interim, on March 29, 2007, City Council enacted an ordinance, over the veto of then-Mayor John Street, submitting a ballot referendum that would have prohibited Council from taking certain actions that would have permitted gaming within designated areas of the City. Upon the Board's emergency petition, this Court permanently enjoined submission of the ballot question. *See Pa. Gaming Control Bd. v. City Council*, 593 Pa. 241, 928 A.2d 1255 (2007).

May 30, 2007, after PEDP spent months working with the City to craft a plan of development that addressed issues of concern to the City and to residents living near the Foxwoods site, then-Mayor John Street submitted three CED bills related to PEDP's plan of development ("the CED Legislation"). The CED Legislation would: (1) designate the Foxwoods site as a CED; (2) approve PEDP's plan of development; and (3) revise two rights-of-way (vacate one right-of-way for water main purposes and widen another for drainage, water main, and gas main purposes). The CED Legislation was read before an open session of City Council, but no member was willing to sponsor it. On August 21, 2007, the Planning Commission approved PEDP's plan of development subject to the following two provisos:

1. Foxwoods may only apply for building permits for development beyond what is labeled as Phase I in the Plan of Development if, in addition to all other necessary approvals from relevant governmental bodies, Foxwoods has completed a transportation plan that, in the City's determination after receiving the advice of the City Planning Commission, adequately addresses and funds the needs of an expanded casino complex.

2. The City Solicitor certifies that an agreement has been reached between the City and Foxwoods that adequately and appropriately addresses the issues raised by the Philadelphia Gaming Advisory Task Force, including, but not limited to, a commitment by Foxwoods to support a Special Services District.

Exhibit F to Petition for Review at 3. On November 28, 2007, then-City Solicitor Romulo L. Diaz, Jr., certified that the City and PEDP had reached the agreement referenced in the second proviso to the Planning Commission's approval of PEDP's plan of development ("Proviso Two Agreement").

Notwithstanding the Planning Commission's approval of PEDP's plan of development in August 2007, none of the three bills composing the CED Legislation was introduced in City Council by January 4, 2008, when PEDP filed this Verified Petition for Review against City Council and the City, along

with an Application for Summary Relief and Expedited Briefing Schedule.

In the two filings *sub judice*, PEDP requests that we issue an order similar to that entered in *HSP Gaming:* (1) declaring that the site approved by the Gaming Board for Foxwoods Casino is zoned as a CED pursuant to Section 14–400 of the Ordinance; (2) declaring that, pursuant to Section 14–400, PEDP's plan of development that was approved by the Planning Commission is deemed finally approved; (3) declaring that all revisions, relocations, strikes and vacations of easements and public rights-of-way identified in the approved plan of development are authorized; (4) directing the City to take all actions necessary to implement the relief granted; and (5) retaining jurisdiction to address any further matters that should arise.

Also on January 4th, the City filed a response brief, stating that it believed that *HSP* mandates that PEDP's requested relief be granted, given that there is no material difference between where PEDP stands today and where HSP stood when this Court issued its decision in *HSP.* After the Honorable Michael Nutter assumed the Philadelphia Mayor's office on January 7th, the City filed, on January 25th, an "Application for Leave to Withdraw 1/4/2008 Response Brief and to File the City's Brief in Opposition to Application for Summary Relief and Petition for Review." In this filing, the City reverses itself and now claims that PEDP's case differs from HSP's because there are significant continuing developments in this matter, including "critical legislation" introduced into City Council on January 24, 2008. The City asserts that it is entitled to change its legal position from what it deems to be a prior incorrect legal interpretation, that the issues raised by PEDP should first be litigated in common pleas court, and that expedited review is unnecessary.[5]

5. On February 5th, PEDP filed an answer opposing the City's application for leave to withdraw its initial brief; on February 13th, the City filed an Application for Leave to File Reply Memorandum in support of its January 25th application for leave to withdraw; and on February 21st, PEDP filed a brief opposing the City's request for leave to reply.

A Brief in Opposition to PEDP's Petition for Review and its Application for Summary Relief and Briefing Schedule was filed by the City on January 25, 2008. In its Brief, the City notes that, the day before, on January 24th, two bills that are prerequisites to issuance of a CED zoning permit to PEDP were finally introduced: one that would rezone the Foxwoods site as a CED and a second that would approve PEDP's plan of development. Notably, as for the relief requested by PEDP, the City agrees that the relief is "virtually identical" to the relief that this Court ordered in *HSP*. City's Brief at 14 (filed Jan. 25, 2008). The City maintains, however, that the facts *sub judice* are distinguishable from those before us in *HSP*.

On February 21st, PEDP filed an Application for Leave to File Reply Brief in support of its January 4th application for summary relief. City Council filed a brief opposing PEDP's request for leave to reply on March 4th. On March 14th, this Court entered a *per curiam* order submitting this matter for decision on the existing briefs and taking the various ancillary matters under advisement.

In its petition for review, PEDP invokes this Court's appellate jurisdiction pursuant to Section 1506 of the Gaming Act, which provides as follows:

## § 1506. Licensed facility zoning and land use appeals

In order to facilitate timely implementation of casino gaming as provided in this part, notwithstanding 42 Pa.C.S. § 933(a)(2) (relating to appeals from government agencies), the Supreme Court of Pennsylvania is vested with exclusive appellate jurisdiction to consider appeals of a final order, determination or decision of a political subdivision or local instrumentality involving zoning, usage, layout, construction or occupancy, including location, size, bulk and use of a

We hereby deny the City's Application to Withdraw its initial brief, but we will also accept the City's subsequent "Brief in Opposition." All succeeding applications respecting the City's litigation position are denied. Accordingly, we have considered both substantive filings by the City.

licensed facility. The court, as appropriate, may appoint a master to hear an appeal under this section.

4 Pa.C.S. § 1506.

In *HSP,* this Court held that City Council's refusal to act with respect to HSP's plan of development constituted a "final order, determination or decision" within the meaning of Section 1506. *HSP,* 939 A.2d at 280–81. In so holding, we reasoned that

[i]t would be an absurd result to conclude that an appeal from a political subdivision's final decision to approve or reject a plan of development may be taken immediately to this Court under § 1506, but that no such appeal may be taken if the political subdivision simply refused to act, thereby halting implementation of the Gaming Board's decision to locate a licensed facility. *See* 1 Pa.C.S. § 1922(1). Indeed, Council's interpretation would violate the Statutory Construction Act by requiring us to disregard the General Assembly's express instruction in § 1506 that it aims "to facilitate timely implementation of casino gaming."

*Id.* at 281.

Instantly, PEDP argues that City Council's failure to enact the CED Legislation respecting its planned casino likewise constitutes a "final order, determination or decision" for purposes of Section 1506. Therefore, PEDP contends, this Court's holding in *HSP* that Council's inaction triggered our Section 1506 jurisdiction is controlling here.

In response, the City, as represented by the new mayoral administration, attempts to distinguish *HSP,* emphasizing that, in that case, "there was no indication that the bills ever were going to move through Council, or that Council was giving any serious consideration to the bills." City's Brief at 20 (filed Jan. 25, 2008). The City emphasizes that, in *HSP,* the legislation had been laying dormant for more than six months by the time this Court exercised our Section 1506 jurisdiction. In contrast, here, the City asserts, PEDP's plan of development did not even become ripe for consideration by Council until November 28, 2007 at the earliest, when the City

Solicitor certified that the parties had reached the Proviso Two Agreement, and only a month before the end of Council's 2004–07 term. Moreover, the City notes, two CED bills were introduced on January 24, 2008 at the first business meeting of the new term. City Council does not challenge this Court's Section 1506 jurisdiction in its Brief.

According to the City's own calculation, it is now over seven months since the Planning Commission's approval of PEDP's plan of development, and ten months since Mayor Street submitted the CED Legislation. It is also four months since the City Solicitor's certification. Yet no CED legislation has been enacted. While the City emphasizes that CED legislation has now been introduced in City Council, the same was true in *HSP*. As the pleadings in this case do not inform us that any CED legislation relating to PEDP's approved plan of development has actually been enacted, we see no material difference between the circumstances before this Court in *HSP* and those presented today. Accordingly, we find that PEDP's petition for review implicates our exclusive appellate jurisdiction under Section 1506 of the Gaming Act.

In seeking its requested relief, PEDP notes that the Gaming Board has exclusive authority to determine the location of licensed slot machine facilities in Philadelphia. PEDP alleges that City Council has endeavored to impede the enactment of CED legislation in direct contravention of the Gaming Board's licensing decision and this Court's decision in *HSP*. As a result, PEDP contends, PEDP has been unable to secure the necessary zoning and use registration, building and other permits necessary to commence construction. As one of many examples of what it calls City Council's "obstructionist behavior," PEDP cites a press release issued by Councilman Frank DiCicco on December 20, 2006, the date on which the Board awarded slot machine licenses to PEDP and to HSP. In the press release, Councilman DiCicco, whose district encompasses the Foxwoods site, announced his intention to appeal the decision, stating, *inter alia*, "I think it's a horrible decision. I will do everything I can to delay construction of the facilities until some of these serious concerns are addressed." Exhibit

L to Petition for Review. PEDP further notes that, on January 23, 2007, Councilman DiCicco introduced a series of eight proposed ordinances "intended expressly to delay, limit or exclude gaming from the sites selected by the Gaming Board." Petition for Review at ¶ 48. In a letter to counsel for PEDP dated January 25, 2007, the Councilman himself characterized the ordinances he proposed as a "legislative package that challenges the State's authority to dictate the City's economic development." Exhibit M to Petition for Review. PEDP also cites an August 9, 2007 letter to Governor Edward G. Rendell, in which the Councilman requested that the Governor consider other suggested sites for gaming facilities and pledged that "I will make my best effort to hold the necessary legislation that would permit casino construction until you complete a full review of the matter." Exhibit T to Petition for Review. Similarly, PEDP refers to an October 18, 2007 letter to then-Mayor Street in which the Councilman warned that "[u]ntil this body receives adequate answers from the City, the State and the operators, I can not and will not support legislation that permits construction of these projects." Exhibit X to Petition for Review.

PEDP further explains how it is that a single councilman could exert controlling influence over legislation affecting his district. PEDP notes that City Council's long delay in considering CED legislation is attributable to Council's adherence to the well-established local tradition of "councilmanic prerogative." According to PEDP, by following councilmanic prerogative, City Council has simply deferred to the opposition of Councilman DiCicco because the Foxwoods site is located in his councilmanic district. PEDP contends that City Council began to affirmatively demonstrate its deference to Councilman DiCicco's opposition to the Gaming Board's decision, when, on March 15, 2007, it unanimously approved the anti-casino ballot referendum that this Court invalidated in *Pennsylvania Gaming Control Board v. City Council*, 593 Pa. 241, 928 A.2d 1255 (2007), and, on March 29th, when Council re-enacted the ordinance over the veto of Mayor Street. As further evidence of the collective intransigence of City Council

with respect to the Gaming Board's decision, PEDP cites a resolution Council enacted on April 19, 2007 purporting to rezone the Foxwoods site from C–3 Commercial to R–10A Residential and Council's overriding of the Mayor's veto on May 10, 2007.[6]

PEDP emphasizes that it has satisfied all preconditions to City Council's approval of the CED Legislation. PEDP notes that, on October 17, 2007, it paid the requisite $50 million license fee required by the Gaming Act and that, on November 23, 2007, it reached the Proviso Two Agreement with the City.

PEDP asserts that City Council's refusal to implement CED zoning has caused irreparable harm because it has prevented PEDP from obtaining the zoning and other permits necessary to commence construction and operation of the gaming facility, thereby curtailing the implementation of state-wide tax relief to the citizens of the Commonwealth. PEDP further contends that the delay also has a significant impact on the City's five-year financial plan that includes approximately $71 million in host fees attributable to licensed gaming operations and $5 million annually in host fee payments for the Philadelphia School District.

In response, City Council reiterates the argument made by the City in challenging jurisdiction—i.e., that PEDP's plan of development did not become ripe for Council's consideration until November 28, 2007 at the earliest, when the City Solicitor certified that the parties had reached the Proviso Two Agreement, only a month before the end of Council's term. Council further asserts that it is not for this Court or PEDP to inquire into the motivations of City Council (even though we have done so in *HSP*). City Council argues that Councilman DiCicco's actions cannot be imputed to all of City Council, referring to Councilman Juan Ramos' eventual introduction of a CED ordinance in *HSP* as indicative of the independence of

**6.** PEDP challenged the constitutionality of the rezoning ordinance in *Philadelphia Entertainment and Development Partners, L.P. v. City of Philadelphia,* 937 A.2d 385 (Pa.2007), where this Court held that the challenge was not ripe for adjudication because the ordinance had not yet been applied so as to subvert the Board's decision and hinder PEDP's desired use of its licensed Foxwoods site.

other Council members in the instant case (even though no similar action was taken by any Council member on behalf of PEDP by the time of its filing).

City Council also argues that the Planning Commission's approval of PEDP's plan of development would require the abandonment of a right-of-way for water main purposes. Citing Section 1505 of the Gaming Act, 4 Pa.C.S. § 1505 (prohibiting Commonwealth and political subdivisions thereof from exercising eminent domain for construction of licensed gaming facilities), City Council argues that the Gaming Act expressly forbids the City from abandoning a right-of-way, as required by PEDP's plan of development. This Court lacks the authority, in City Council's words, to exercise "what would effectively be the equivalent of the power of eminent domain." City Council's Verified Opposition to Application for Summary Relief and Expedited Briefing Schedule at 15.

For its part, the City, again as represented by the new mayoral administration, restates City Council's claim that PEDP's plan of development was not ripe for consideration until former City Solicitor Diaz's November 28, 2007 certification. The City asserts that PEDP grossly misrepresents the facts in suggesting that City Council has refused to take any action on PEDP's plan of development and that Council is "guilty of 'deliberate inaction' akin to that found in *HSP.*" City's Brief in Opposition to Petitioner's Application for Summary Relief and Petition for Review at 33. Instead, the City submits, Council is "actively considering a package of CED legislation and has simply not been afforded a reasonable opportunity to undertake meaningful review." *Id.* The City therefore implores this Court not to "impose a timeframe on this process." *Id.* at 34.

The City's current position on Council's past action (or inaction) stands in stark contrast to the position the City took on the same issue under the Street administration, which oversaw the prior year's development of PEDP's plan. *See Phila. Entm't & Dev. Partners, L.P. v. City of Philadelphia,* 937 A.2d 385 (2007) ("*Rezoning Case*") (deeming PEDP's challenge to constitutionality of rezoning ordinance unripe

because ordinance had not yet been applied so as to subject Gaming Board's decision and hinder PEDP's desired use of its licensed Foxwoods site). After this Court denied relief in the *Rezoning Case*, PEDP applied for reargument, citing the intervening decision in *HSP, supra,* and arguing that it was now identically situated to HSP such that identical relief was warranted. In its own brief, the City supported PEDP's request for relief on reargument. The City's contemporaneous view of Council's action was expressed as follows:

The City has no objection to the Court issuing an order materially similar to that issued in *HSP*. For the City to perform its role under the state-mandated regulatory scheme, it is unfortunately necessary that the Court direct and authorize the City to take the steps required to issue a CED zoning and use registration permit to Foxwoods, thereby allowing Foxwoods to build the casino the General Assembly and the Gaming Control Board authorized on the Property.

Foxwoods' situation has evolved since this suit was commenced in June so that there is now no material difference between where Foxwoods stands today and where Sugar-House Casino stood before the Court ruled in *HSP*. Foxwoods has worked with the City for much of 2007 to craft a development proposal that addresses issues identified by the City, neighbors, and by Foxwoods itself, eventually reaching the same place where SugarHouse was at the time of *HSP*. Foxwoods has developed a Plan of Development that the Planning Commission approved, the same status that applied to SugarHouse at the time of *HSP*. As was the case for SugarHouse, proposed legislation designating the Foxwoods CED District, approving the Plan of Development, and addressing related roadway and sewer issues has been developed and transmitted to City Council. As was the case for SugarHouse, City Council has steadfastly refused to address the proposed legislation, in Foxwoods' case, even declining to introduce the proposed bills.

In short, Foxwoods has proceeded through all the City's processes and now finds itself stymied by the same deliber-

ate City Council inaction that led to this Court's decision in *HSP.*

City's Brief re PEDP's Application for Reargument in *Rezoning Case* at 6–7 (filed Dec. 12, 2007). In its initial brief in the case *sub judice,* the City reiterated this same position nearly verbatim. *See* City's Brief at 5–6 (filed Jan. 4, 2008).

The City, via the new mayoral administration, further argues that this Court should dismiss PEDP's request for relief pursuant to the doctrine of *lis pendens* because the issues *sub judice* are already being litigated in the Court of Common Pleas. *See Rezoning Case, supra* (transferring to common pleas court PEDP's request for writ of mandamus directing City to issue C–3 or CED zoning and use registration permit). Citing Rule of Civil Procedure 1028(a)(6) (allowing preliminary objections to be filed on grounds of pendency of prior action or agreement for alternative dispute resolution), the City contends that the instant case should be dismissed because it is duplicative of the re-zoning case currently before the common pleas court "with respect to the current substantive basis of the suit, the parties, and the relief requested." City's Brief at 37 (filed Jan. 25, 2008).

The City also specifically opposes the ancillary relief requested by PEDP—*i.e.* authorization of all revisions, relocations, strikes and vacations of easements and public rights-of-way identified in PEDP's plan of development. Specifically, the City asserts that the requested street strikes were not ordered by the Gaming Board as part of licensure and that, even if the Board had so ordered, this would constitute an unauthorized exercise of the power of eminent domain. Finally, in the event this Court deems PEDP's plan of development approved, the City urges us to limit such approval to PEDP's right to build and operate a casino, as opposed to additional amenities (*e.g.,* restaurants, bars, retail shops, and a multi-purpose showroom) beyond the scope of the Gaming Board's February 1, 2007 order.

In its reply brief, PEDP refutes the City's argument that PEDP's plan of development did not become ripe for consider-

ation until November 27, 2007. Because approval of a plan of development is the second step in Council's two-step procedure set forth by the Ordinance before construction of a gaming facility may begin, PEDP argues that the fact that Council has failed even to take the first step (*i.e.,* establishment of the Foxwoods site as a CED) proves that this argument is merely "a pretext invented solely for the purposes of this litigation." PEDP's Reply Brief at 13. As for City Council's argument that the Gaming Act expressly forbids the City from abandoning a right-of-way, as required by PEDP's plan of development, PEDP replies that Council is collaterally estopped from raising this issue because it already did so unsuccessfully in *HSP. See HSP,* 939 A.2d at 288 (deeming approved "all revisions, relocations, strikes and vacations of easements and public rights of way identified in the Plan of Development"). With respect to the City's reliance on the introduction of two CED bills on January 24, 2008, PEDP asserts that the bills are "larded with eight conditions . . . that can be satisfied only by further action by City Council at some unspecified date and in the exercise of apparently unfettered discretion." PEDP's Reply Brief at 19 n. 9.

With respect to the delay that PEDP has experienced in seeking implementation of the Gaming Board's decision awarding it a Category 2 license, we turn to our analysis in *HSP* concerning City Council's alleged obstruction of the same decision:

> The comprehensive information required to be submitted to the City of Philadelphia's Planning Commission by the CED Ordinance demonstrates the rigorous demands of local zoning provisions with respect to the development of gaming sites. After the Planning Commission approved HSP's Plan of Development and the Plan was submitted to City Council for its consideration, neither *PAGE* [7] nor the Philadelphia Code permitted City Council to refuse consideration of the submission for the purpose of delaying and obstructing

7. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005).

implementation of the Gaming Board's Adjudication and Order regarding the situs of the gaming facility.

A political subdivision has no power to override the statutory provisions of the Gaming Act regarding the situs of a licensed gaming facility or to use its authority to zone to impede implementation of the Gaming Board's decision in that regard. A member of City Council does not have the authority to use local zoning processes to overturn the Gaming Control Board's approval of an applicant's Category 2 slot machine license. The *PAGE* decision was never intended to permit council members in the City of Philadelphia to pressure successful applicants with promises or enticements of expeditious zoning approvals should they relocate their facilities to another site, especially when a suggested alternate site was originally rejected by the Gaming Control Board.

As recognized by the City of Philadelphia, the City ultimately has no discretion to preclude gaming. We conclude that the undisputed documentation establishes the deliberate inaction by Council for the purposes of delay. This deliberate inaction occurred after the submission of HSP's Plan of Development that was approved by the Planning Commission.

*HSP,* 939 A.2d at 287.

 In our view, this case is controlled by our recent decision in *HSP,* and PEDP is entitled to the same relief that issued in that case. The key date for measuring Council's action (or inaction) is August 21, 2007, the day the Planning Commission approved PEDP's plan of development.[8] At that point, the City, which had been working with PEDP in order to facilitate the state mandate on gaming and implementation of the Board's licensing decision, had already prepared and presented to Council legislation that would have facilitated the permitting process. Council, however, took no action in re-

8. While both City Council and the City emphasize that the Planning Commission's approval was subject to provisos, we note that the same was true in *HSP. See* Exhibit AA to HSP's Petition for Review in *HSP, supra,* at 11.

sponse to the Mayor's action or the Planning Commission's decision. Moreover, with respect to the reasons for Council's inaction, the same facts and background cited in *HSP* appertains here: there is ample evidence that the inaction was a deliberate attempt by Council to simply delay the construction of the casinos.

Further, this record also supports PEDP's argument that the fact that the City and PEDP did not reach the Proviso Two Agreement until November 2007 has been offered as but a *post hoc* rationalization on the part of City Council to explain its inaction. In August 2007, the same month that PEDP's plan of development was approved by the Planning Commission, Councilman DiCicco announced that he would prevent enactment of the CED Legislation until the Governor "complete[d] a full review." Having failed to secure such review, on October 18, 2007, the Councilman promised the former Mayor continued obstruction until Council "receive[d] adequate answers" from the City, the Commonwealth, and PEDP. Notably, the Councilman's letter to the Mayor, dated nearly two months after the Planning Commission had approved PEDP's plan of development, makes no mention of the allegedly awaited certification from the former City Solicitor that the Proviso Two Agreement had been reached. *See* Exhibit X to Petition for Review. Worse than merely waiting for news that the agreement had been reached, the Councilman continued to actively impede the Gaming Board's decision to locate the Foxwoods Casino in his councilmanic district. It was this same Councilman who was the source of much of the "deliberate inaction . . . for the purposes of delay" of which we found "undisputed documentation" in *HSP*. *See, e.g., HSP*, 939 A.2d at 282–83 (citing Councilman DiCicco's Dec. 20, 2006 press release); *id.* at 283 (quoting Councilman DiCicco's Aug. 9, 2007 letter to Governor Rendell).

As for Councilman DiCicco's colleagues, other than the belated introduction, on January 24, 2008, of two CED bills related to PEDP's plan of development **after the instant petition for review was filed,** neither City Council nor the City cites any action taken by any other Council member in

compliance with their statutory duties to implement the December 20, 2006 decision of the Gaming Board. Nor does Council explain why CED legislation[1] could not have been considered and enacted at any time after August 21, 2007, subject to the same two provisos set forth by the Planning Commission when it approved PEDP's plan of development. City Council could have introduced, considered, and enacted legislation establishing the Foxwoods site as a CED even if it could not, in good conscience, approve PEDP's plan of development until the Proviso Two Agreement was reached. Indeed, as the City stated in its initial brief:

> City Council ... mistakenly focuse[s] on th[e City Solicitor's] certification as an excuse for its illegal inaction. Under the Planning Commission's proviso, the City Solicitor's verification was a condition precedent to issuance of a zoning permit, not consideration by City Council, which under the Commercial Entertainment District Ordinance was free to separately consider the Plan of Development and accept or reject the Planning Commission's provisos.

City's Brief at 4 n. 4 (filed Jan. 4, 2008) (citation omitted).

■ In short, the record *sub judice* simply does not allow us to conclude that City Council had acted to implement the December 20, 2006 decision of the Gaming Board awarding a Category 2 license to PEDP at the time PEDP sought the relief now at issue. We recognize there is a new executive in Philadelphia who has a different view than the former mayor. But the future cannot undo the past. Here, as in *HSP,* we conclude that Council's failure to act, for purposes of delay, was beyond its power, and entitles PEDP to the same relief.[9] Accordingly, we will grant the following relief requested by PEDP:

 (1) the site approved by the Pennsylvania Gaming Control Board for the Foxwoods Casino Philadelphia is zoned as a Commercial Entertainment District pursuant to Chap-

---

9. In light of our conclusion that Council's inaction requires the same relief as in *HSP,* we need not address the additional arguments forward by Council and the City.

ter 14–400 of the Philadelphia Code as in existence on November 1, 2007;

(2) pursuant to Chapter 14–400, Philadelphia Entertainment and Development Partners, L.P. ("PEDP")'s plan of development as approved on August 21, 2007 by the City Planning Commission, including all provisos thereto, is declared to be fully approved and shall require no further approval as if City Council for the City of Philadelphia had approved the same;

(3) all revisions, relocations, strikes and vacations of easements and public rights of way identified in the plan of development as approved by the Planning Commission are authorized;

(4) the City of Philadelphia is directed to take all actions necessary to implement the relief granted, including making all necessary changes to City records, maps and plans, and receiving, reviewing and acting upon all applications from PEDP in the ordinary course and in compliance with this Court's order; and

(5) jurisdiction is retained.

PEDP's February 21, 2008 Application for Leave to File Reply Brief is hereby granted.

Justice EAKIN and BAER, Justice, TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I agree with the majority that *HSP Gaming L.P. v. City Council*, 595 Pa. 508, 939 A.2d 273 (2007), is controlling and, for that reason, Petitioners should receive treatment similar to that afforded to HSP. Absent such controlling precedent, I would favor the appointment of a special master to preside over the development of an evidentiary record and to offer recommended findings and conclusions, as I believe that such a record is conventionally necessary to address core, disputed factual matters, such as those regarding City Council's inten-

tions and conduct. *Accord HSP,* 595 Pa. at 534, 939 A.2d at 288 (Saylor, J., dissenting).